**Rafael FERNANDEZ–ROQUE, et al., Petitioners,**

**v.**

**William French SMITH, et al., Respondents.**

**Moises GARCIA–MIR, et al., Plaintiffs,**

**v.**

**William French SMITH, et al., Defendants.**

**Orlando CHAO–ESTRADA, Petitioner,**

**v.**

**William French SMITH, et al., Respondents.**

**Civ. A. Nos. C81–1084A, C81–938A and C81–1350A.**

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 15, 1984.

Dale Schwartz, Myron Kramer, Deborah Ebel, Kenneth Hindman, David Webster, Atlanta, Ga., for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., Lauri S. Filppu, Dept. of Justice, Washington, D.C., Larry D. Thompson, U.S. Atty., Barbara V. Tinsley, Asst. U.S. Atty., Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.

Plaintiffs in this case are those Cubans who arrived in the United States as part of the 1980 "Freedom Flotilla" and who were, are, or will be incarcerated at the Atlanta Penitentiary. *Fernandez-Roque v. Smith*, 91 F.R.D. 117, 122–24, *as modified*, 91 F.R.D. 239, 240 n. 1 (N.D.Ga.1981). Presently before the Court is plaintiffs' "Second Renewed Motion for Habeas Corpus," pursuant to 8 U.S.C. § 1105a(b), seeking judicial review of their final orders of exclusion. Specifically, plaintiffs have petitioned the Court to review the November 30, 1983 decisions of the Board of Immigration Appeals (BIA or Board) that denied plaintiffs' class-wide motions to reopen their asylum claims. Plaintiffs base their claims to asylum on their membership in the Freedom Flotilla.

For the reasons that follow, this Court finds that BIA abused its discretion in denying plaintiffs' motions to reopen. Accordingly, the Court reverses and remands these cases to BIA, with directions to reopen plaintiffs' exclusion cases and to consider on the merits plaintiffs' claims to

asylum based on their membership in the Freedom Flotilla. All final orders of exclusion for class members are set aside pending the outcome of these proceedings on remand.

## BACKGROUND

In 1981, by amendment to their original complaint, plaintiffs contended that as a result of having left Cuba in the 1980 Freedom Flotilla, they as a class have a well-founded fear of persecution if returned to Cuba. As relief they sought (1) release from imprisonment as asylees or refugees under Article 31 of the Protocol Relating to the Status of Refugees, and (2) withholding of deportation (or an injunction against deportation to Cuba) under Article 33 of the Protocol and under 8 U.S.C. § 1253(h). On August 19, 1981, this Court entered a temporary restraining order prohibiting their deportation to Cuba.

Defendants then challenged this Court's jurisdiction to entertain these class-wide asylum claims and sought review in the Eleventh Circuit Court of Appeals. In *Fernandez-Roque v. Smith*, 671 F.2d 426 (11th Cir.1982), the Court of Appeals directed this Court to decide whether it had jurisdiction over plaintiffs' class-wide asylum claims. On April 28, 1982, this Court responded by holding that (1) it had jurisdiction to review on a class-wide basis by way of habeas corpus the final orders of exclusion for those class members who had fully exhausted their administrative remedies; (2) it lacked jurisdiction to review final orders of exclusion for class members who had never appealed to BIA; and (3) it lacked jurisdiction over plaintiffs' claim of entitlement to a remand to the Immigration

and Naturalization Service (INS) for a class-wide asylum hearing. *Fernandez-Roque v. Smith*, 539 F.Supp. 925 (N.D.Ga. 1982).

On June 15, 1982, those class members over whose asylum claims the Court at that time had no jurisdiction filed a motion to reopen their asylum claims before an Immigration Judge (IJ). *Matter of Leon-Orosco.* On the same day, class members over whose asylum claims the Court had jurisdiction filed a motion to reopen directly with BIA. *Matter of Rodriguez-Colas.* Although these two motions were filed not as class motions but as individual ones, the parties stipulated that they would be test cases, "binding on all asylum/withholding of deportation issues relating to membership in the Freedom Flotilla as a social group except with respect to statutory and regulatory exceptions to asylum/withholding eligibility." Thus, the effect of these test cases was a class-wide motion to reopen the asylum claims.[1]

In support of their motions to reopen, plaintiffs submitted the following evidence:

(1) Thirteen Mariel Cubans submitted affidavits stating that they previously had never been jailed in Cuba; that they voluntarily returned to Cuba in 1980 because they were homesick; that they were incarcerated, tortured, indicted, and tried as "Mariel scum" who illegally entered Cuba; that on the one year anniversary of Mariel they were set adrift on the ocean without food, water, or navigational equipment; and that they were told they were no longer Cubans and that all who left via Mariel were traitors. The Cuban indictments for the 13 returnees not only accused them of illegal entry but also specifically described

---

1. The decisions on the motion to reopen and in the reopened hearing are binding on all class members who have final orders of exclusion entered against them by an IJ and who have not appealed to BIA. Although, the stipulation was also binding on class members who have not received final orders of exclusion from an IJ after an exclusion hearing, that group is not before the Court for judicial review under 8 U.S.C. § 1105a(b) unless and until they receive a final order of exclusion from an IJ.

Similarly, these decisions are binding on all class members who had final orders of exclusion entered against them by an IJ, who have appealed to BIA, and whose final orders of exclusion have been affirmed on appeal. Although the stipulation was also binding on class members who have appealed to BIA and who are waiting for a decision, that group is not before the Court for judicial review under 8 U.S.C. § 1105a(b) unless and until BIA dismisses their appeal or affirms the final orders of exclusion.

the returnees as "all of bad social antecedents, who abandoned the national territory in the first months of 1980 as scum, by the way of Mariel."

(2) Plaintiffs submitted State Department Country Reports on Human Rights Practices in Cuba for 1980 and 1981, documenting the inhumane treatment received by Mariel Cubans prior to leaving Mariel Harbor and by others who sought to leave but were not allowed to depart. The Reports confirmed that some Mariel Cubans have returned to Cuba, but stated that their treatment after return to Cuba was unknown.

(3) Plaintiffs also submitted correspondence from the State Department confirming that the Cuban government's response to early efforts to repatriate Mariel Cubans was that all Cubans who left via Mariel have made an irrevocable decision to leave Cuba.

(4) Plaintiffs introduced a statement by the U.S. Coordinator for Refugee Affairs, dated April 21, 1980, that all Cubans who sought asylum in the Peruvian embassy have a well-founded fear of persecution if returned to Cuba.

(5) Plaintiffs also offered the November 12, 1981 deposition of Jorge Dominguez, Professor of Government at Harvard University and an expert on Cuba; Professor Dominguez testified that although distinctions were plausible among Mariel Cubans, Cuba refused to make such distinctions and treated the entire Freedom Flotilla group as "*escoria*" (scum) who were to blame for Cuba's past problems and whose departure enabled Cuba to have a better future. According to Dominguez, this group of Cuban emigres was treated differently than any previous group of emigres. He believed that the affidavits from the 13 Mariel returnees were credible and that these 13 returnees received harsh treatment not only because they violated Cuban immigration laws in returning but also because they were Mariel scum. Most significantly, Dominguez testified that, in his opinion, if plaintiffs were returned to Cuba, they would be punished under the law of "*peligrosidad*" (state of political dangerousness) and that deprivations under *peligrosidad* would most likely include deprivation of freedom in the form of house arrest or detention in some other place. In addition to the legal sanctions accompanying this state of dangerousness, plaintiffs would be subject to informal community sanctions for four to five years before they were "cleansed" of the enemy "taint". Finally, Dominguez noted that it was possible, although he could not state with certainty, that returning Mariel Cubans would be regarded and punished as traitors. On cross-examination Dominguez acknowledged that, to his knowledge, Cuba had passed no special laws concerning Mariel Cubans and that, to his knowledge, previous groups of Cuban emigres who have visited Cuba with Cuban consent have not been persecuted.

On August 16, 1982, the IJ denied the *Leon-Orosco* motion to reopen, concluding that the Flotilla was not a "social group" for asylum purposes. Plaintiffs appealed this denial to the Board. On November 30, 1983, the Board dismissed the appeal in *Leon-Orosco* and, in a virtually identical decision, denied the motion to reopen in *Rodriguez-Colas*. The Board assumed *arguendo* that the Flotilla was a social group, but held that plaintiffs had failed to make out a prima facie case of a "well-founded fear of persecution." *See Matter of Leon-Orosco and Rodriguez-Colas* (BIA November 30, 1983).

On February 10, 1984, plaintiffs filed a "Renewed Motion for Habeas Corpus to Review and Reverse Decision of Board of Immigration Appeals." On the same date the Commissioner of INS, pursuant to 8 C.F.R. § 3.1(h)(ii), certified to the Attorney General for review two issues related to the decisions of the Board in *Leon-Orosco* and *Rodriguez-Colas*. Consequently, this Court delayed its decision on "Plaintiffs' Renewed Motion for Habeas Corpus" pending a response by the Attorney General. On July 27, 1984, the Attorney General

approved BIA's handling of both issues.[2] *Matter of Leon-Orosco and Rodriguez-Colas* (A.G. July 27, 1984). On July 31, 1984, plaintiffs filed their "Second Renewed Motion for Habeas Corpus," seeking judicial review of the decisions of BIA.[3]

## JURISDICTION

■ An alien against whom a final order of exclusion has been entered may obtain judicial review of that order by habeas corpus proceedings in district court. 8 U.S.C. § 1105a(b). An order of exclusion shall not be reviewed by any court unless the alien has exhausted the administrative remedies available to him as of right. 8 U.S.C. § 1105a(c). At present, all class members have fully exhausted their administrative remedies with respect to their claims to asylum and withholding of deportation based on membership in the Freedom Flotilla. This Court has jurisdiction to review their final orders of exclusion, which include the denial of asylum and withholding of deportation.

## STANDARD OF PROOF IN MOTION TO REOPEN

■ In considering a motion to reopen, the BIA must determine on the basis of the moving papers, affidavits, and other supporting evidence whether petitioners have presented a prima facie case of eligibility for the relief sought.[4] *Aguilar v. INS*, 638 F.2d 717, 719 (5th Cir. Unit B 1981), *citing Urbano de Malaluan v. INS*, 577 F.2d 589, 593 (9th Cir.1978). The ultimate relief sought by plaintiffs is asylum and withholding of deportation. Although not directly at issue in this motion to reopen, to prevail on the merits in a reopened hearing plaintiffs would have to demonstrate a well-founded fear of persecution for asylum and a clear probability of persecution for withholding. *INS v. Stevic*, —— U.S. ——, 104 S.Ct. 2489, 2497 n. 18, 81 L.Ed.2d 321 (1984).

■ The Ninth Circuit recently explained the purpose of a motion to reopen:

The motion to reopen is only a preliminary proceeding, representing the first in a series of hurdles that the alien must clear to obtain relief .... The motion to reopen is not intended to be a substitute for a hearing. Its purpose is merely to allow the Board to screen out those claims that clearly lack merit and thus can be disposed of without a hearing. The function of the Board at the motion-to-reopen stage of the proceedings is not to make a determination of the alien's eligibility for relief.... The function of the Board is merely to determine whether the alien has set forth a prima facie case of eligibility for relief.

*Reyes v. INS*, 673 F.2d 1087, 1089–90 (9th Cir.1982) (citations omitted). Thus, the Board's role in a motion to reopen is not to render ultimate decisions of fact, but rather to determine whether plaintiffs have made a sufficient showing to warrant reopening their asylum claims and providing them a full hearing.

## SCOPE OF JUDICIAL REVIEW

■ This Court is aware of the narrow scope of judicial review and the deference given to agencies in the review of administrative cases. The Court is also mindful that it must not substitute its own judgment for that of the agency. Decisions of the Board in denying a motion to reopen,

---

**2.** INS had complained to the Attorney General that BIA should have approved the stipulations entered into between the parties and that BIA should have ruled on whether the Flotilla was a social group for asylum purposes. The Attorney General found that INS had misread the BIA decision and that BIA did not in fact reject the stipulations, but merely found it unnecessary to discuss their effect. The Attorney General also approved BIA's failure to rule on whether the Flotilla was a social group.

**3.** In this motion plaintiffs have not challenged the Attorney General's decision. Thus, the Court limits its review to BIA's decisions denying plaintiffs' motions to reopen their asylum claims.

**4.** There are various technical requirements for a motion to reopen, *see* 8 C.F.R. §§ 3.2, 103.5, 242.22; however, the BIA did not rest its refusal to reopen on any technical failure to comply with these regulations.

however, are subject to review for abuse of discretion and for errors of law. *Te Kuei Liu v. INS,* 645 F.2d 279, 283 (5th Cir. Unit A 1981).

Courts have recognized several circumstances in which a BIA decision would constitute an abuse of discretion. Courts in this circuit and elsewhere have declared that INS has abused its discretion when it has denied reopening despite the alien's demonstration of a prima facie case. *See, e.g., Vargas-Gonzales v. INS,* 647 F.2d at 457, 459; *Samimi v. INS,* 714 F.2d 992, 995 (9th Cir.1983). It would also be an abuse of discretion for the BIA to distort or disregard important aspects of the alien's claim. *Reyes v. INS,* 673 F.2d at 1089. It has also been held to be an abuse of discretion for the BIA to prejudge the case on the merits at the reopening stage. *Motamedi v. INS,* 713 F.2d 575, 576 (10th Cir.1983). Finally, when the BIA applies incorrect legal standards, the BIA's decision is subject to review for errors of law. *Te Kuei Liu v. INS,* 645 F.2d at 283.

### REVIEW OF BIA'S DECISIONS DENYING PLAINTIFFS' MOTION TO REOPEN

■ This Court has studied the evidence submitted by plaintiffs in support of their motion to reopen and has carefully considered the BIA decision in light of the evidence. The Court has also thoughtfully evaluated the arguments presented by the Service and the Cubans. The Court determines that the BIA has abused its discretion by using an incorrect legal standard in deciding the motion, by disregarding or mischaracterizing evidence tending to establish plaintiffs' claim of a well-founded fear of persecution, and by impermissibly prejudging the case on the merits at the reopening stage.

First, BIA abused its discretion by employing an erroneous and improper legal standard. BIA stated its rationale for denying the motion to reopen as follows:

> Neither the lawful nor unlawful return of the Mariel participants is a present reality. The applicants' motion fails to demonstrate prima facie a present realistic likelihood of persecution.

BIA thus considered whether deportation was a "present reality" and, since it was not, determined that plaintiffs had no present reason to fear persecution. However, neither the asylum statute, 8 U.S.C. § 1158, nor the statute defining a "refugee," 8 U.S.C. § 1101(a)(42)(A), makes actual or threatened deportation or return, or the method of return, a criterion to be considered in the decision to grant asylum or refugee status. BIA's interpretation of the relevant statutes is unfounded and erroneous as a matter of law. The correct test for evaluating the type of asylum claim raised by plaintiffs is the one specified by the statute: whether the alien has demonstrated a well-founded fear of persecution. 8 U.S.C. §§ 1158, 1101(a)(42)(A).

Second, BIA abused its discretion because, in deciding that plaintiffs had failed to show prima facie a well-founded fear of persecution, BIA disregarded or mischaracterized evidence tending to establish a well-founded fear of persecution. Several aspects of BIA's decision reflect this flaw. One example is that BIA characterized the thirteen Mariel returnees as "those Cubans who sought to enter Cuba without first obtaining permission and in violation of Cuban travel laws," apparently attributing the persecution of returnees solely, or almost entirely, to their illegal entry into Cuba. The expert testimony of Professor Dominguez, however, contradicts BIA's apparent conclusion: "The mere fact of [the 13 returnees'] departure via Mariel was in itself among the aggravating circumstances for which the returnees were punished." Dominguez Deposition at 69.

Another, more egregious, example of BIA's mischaracterization of the evidence was its interpretation of Professor Dominguez's testimony regarding the likely treatment of plaintiffs if they are returned to Cuba:

> [T]he testimony of Professor Dominguez clearly suggests that Mariel participants who are returned pursuant to an agreement would not experience treatment

similar to those nationals who attempted to illegally re-enter Cuba. His testimony further suggests that while Mariel participants so returned would not be comfortable, it would be primarily the result of the economic and social upheaval taking place in Cuba, which affects the entire population, rather than a specifically directed course of persecution.

BIA's characterization of the expert testimony is indefensible. Dominguez testified that even if the Mariel Cubans were returned pursuant to an agreement with Cuba, *"at a minimum,* the Cuban government would classify all those so returned as being in the 'State of Dangerousness.' " Dominguez Deposition at 63 (emphasis added). The incidents of the state of dangerousness—"deprivation of freedom, some elements of house arrest, some element of compulsory work"—surely are severe enough to constitute "persecution," especially when at least one court has held that deprivation of an *economic* nature can establish persecution for asylum purposes. *Kovac v. INS,* 407 F.2d 102, 107 (9th Cir. 1969). Further, Dominguez testified that the returning Mariel Cubans also would suffer informal sanctions lasting four or five years. Dominguez Deposition at 65–66. It puzzles the Court how BIA could have interpreted this testimony as indicating only that the returning Mariel Cubans "would not be comfortable," and that their harsh treatment would not be the result of a "specifically directed course of persecution." Moreover, plaintiffs were not required to show that they would "experience treatment *similar* to those nationals who attempted to illegally re-enter Cuba" (emphasis added); persecution can take many forms. For all these reasons, BIA abused its discretion in disregarding or mischaracterizing evidence that this Court finds sufficient to establish prima facie a well-founded fear of persecution.

Third, the Board abused its discretion by prejudging the case on the merits, instead of limiting its inquiry to whether plaintiffs had presented a prima facie case. *See Motamedi v. INS,* 713 F.2d 575 (10th Cir. 1983). As the Court has already noted, a decision on, a motion to reopen should not be a ruling on the ultimate merits of claims to asylum and withholding of deportation. Although BIA need not have assumed that plaintiffs would present more persuasive evidence in a reopened hearing, it incorrectly assumed that plaintiffs would have *no* further evidence to present.[5]

In sum, the Court holds that BIA abused its discretion by employing an incorrect legal standard, by disregarding or mischaracterizing evidence tending to establish plaintiffs' claims, and by prejudging the case on the merits. The Court finds that plaintiffs made a sufficiently strong showing before the agency to justify a full hearing with a thorough consideration by the agency of their asylum and withholding of deportation claims. Plaintiffs' evidence compares favorably with evidence presented in other cases in which courts have ordered proceedings to be reopened. *See, e.g., Motamedi v. INS,* 713 F.2d at 576; *Samimi v. INS,* 714 F.2d at 995. Still, as the Ninth Circuit noted in *Samimi,* a finding that a *prima facie* showing has been made entitles plaintiffs only to a hearing and does not preordain the result of that hearing. 714 F.2d at 995.

The Court therefore REVERSES the decisions of BIA in *Leon-Orosco* and *Rodriguez-Colas* and REMANDS the cases to BIA with directions to reopen plaintiffs' exclusion cases and to consider on the merits plaintiffs' claims to asylum based on their membership in the Freedom Flotilla. More specifically, the BIA is DIRECTED to hold a hearing and to decide (1) whether

---

5. Plaintiffs advised the IJ that additional evidence from journalists and others who had recently been in Cuba would be presented in a reopened hearing. Moreover, according to plaintiffs' reply brief and oral argument, in the two years since the motion to reopen was filed additional evidence to support their claim has come to plaintiffs' attention, including the 1984 State Department Country Report; Testimony by Elliott Abrams, Assistant Secretary of State for the Bureau of Human Rights and Humanitarian Affairs; and the 1983 Americas Watch Report.

plaintiffs have a well-founded fear, of persecution based on membership in the Freedom Flotilla; (2) whether the freedom Flotilla is a particular social group for asylum purposes; and (3) if it is not a social group, whether plaintiffs qualify for asylum on the ground that their fear of persecution is based on political opinion, *see* 8 U.S.C. § 1101(a)(42)(A). Accordingly, all final orders of exclusion for all class members are set aside pending the outcome of these proceedings on remand.