Beatrice
**ANANEH–FIREMPONG, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 84–1997.

United States Court of Appeals,
First Circuit.

Argued April 5, 1985.
Decided June 24, 1985.

Levin H. Campbell, Chief Judge, filed opinion concurring and dissenting.

Raymond H. Young, Boston, Mass., with whom Young & Bayle, Boston, Mass., and Jonathan H. Stevenson were on brief, for petitioner.

James A. Hunolt, Acting Asst. Director, Washington, D.C., with whom Michael P. Lindemann, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, and Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., were on brief, for respondent.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The petitioner, Beatrice Ananeh-Firempong, asked the Immigration and Naturalization Service to reopen her deportation proceedings so that she could present a claim for withholding of deportation, on the ground that she was a 'political' or 'social' refugee. 8 U.S.C. § 1253(h). An immigration judge granted her motion to reopen, but the Board of Immigration Appeals reversed, stating that she had failed to make out a prima facie case that she would face persecution if returned to her native Ghana. The petitioner seeks review in this court. *See* 8 U.S.C. § 1105a(a); *Sang Seup Shin v. INS*, 750 F.2d 122, 124 n. 4 (D.C. Cir.1984). We believe that the petitioner's affidavits make out a prima facie case for withholding deportation, and that the INS consequently should have reopened her proceeding. We reverse the Board's decision to the contrary.

I

Petitioner, a citizen of Ghana, obtained a visa to study in the United States, overstayed her visa, and, in 1982, was found deportable. In February 1983 she filed a motion to reopen her deportation proceedings, arguing in part that the Attorney General should withhold her deportation because of a threat to her life or freedom if returned to Ghana. She pointed to § 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), which states:

> The Attorney General *shall not* deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(Emphasis added.) Petitioner attached to her motion various supporting documents—an affidavit from an academic expert on African politics, her own affidavit, and several newspaper and magazine articles—which indicated the following facts:

a. The present government of Ghana, headed by former Flight Lt. Jerry Rawlings, came to power in late 1981 as a result of a coup d'etat, overturning the prior constitutional government of Dr. Hilla Limann and the Convention Peoples Party. In late 1982, there were two unsuccessful coup attempts aimed at overthrowing the Rawlings regime.

b. Immediately after these attempted coups, the Rawlings government began persecuting (1) those associated with the former government, (2) members of the Ashanti tribe, and (3) professionals, businesspeople, and those who are highly educated. This persecution has consisted of attacks on many such persons, including killings. *See* Affidavit of Prof. Dushku (stating that "many (perhaps hundreds) have been killed" under the Rawlings regime for their association with the former regime); *see also* the detailed descriptions in *Africa Now*, Dec. 1982, at 11–15.

c. Petitioner's family falls within all three of the above categories. Her father has been an active member of the CPP since its founding, and has held numerous posts in the party. He was a close friend of the former head of state, Dr. Limann, and gave petitioner the middle name Nkurumah, after Kwame Nkruma, the founder of the CPP. Petitioner's father is also an educated professional person, working as Headmaster of Schools of the Presbyterian Unit in Ghana. He owns his own home, and, at least until Rawlings took power, had a substantial bank account. Further, he is a member of the Ashanti tribe. Petitioner's family lives in a prosperous neighborhood inhabited by professionals and businesspeople whom the present government considers to have supported the CPP and who are, therefore, politically suspect.

d. Immediately after the attempted coups in 1982, the government seized the bank account of petitioner's family, and it placed her parents under house arrest. Petitioner's family's telephone service has been interrupted. She has received only one letter from her family since her parents were placed under house arrest, although she previously received letters every few weeks. A phone conversation with a third party revealed that a government soldier beat petitioner's nephew, who was staying at her parents' house, to the point where his intestines were ruptured.

The immigration judge who was assigned to petitioner's case ordered her proceeding reopened. The INS then appealed this interlocutory order to the Board of Immigration Appeals. It argued that the immigration judge had used the wrong form in announcing his decision, and failed to state his reasons for reopening in writing. The INS sought as remedy a remand to the immigration judge for a written statement of reasons. The Board, however, went a step further, and held that the immigration judge should not have reopened the proceeding because petitioner's moving papers did not make out a prima facie case that entitled her to withholding of deportation under the statute. Petitioner now appeals that decision.

## II

At the outset we consider the standard that ought to govern our review of the Board's decision. Courts have often hesitated to 'second guess' the INS, and the Supreme Court has urged caution lest judges remove from INS administrators that power to control the country's borders that Congress entrusted to the agency, not to the courts. *See, e.g., Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972) (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895)); *see also* K. Davis, *Administrative Law Treatise* § 8:10, at 200 (2d ed. 1979) ("The Immigration and Nationality Act is shot through with provisions that 'the Attorney General may, in his discretion' do something for an alien."). The INS points to a number of cases suggesting that the scope of the government's discretionary power in this area of the law is unusually broad—to

the point where a reviewing court would set aside a decision of the sort here at issue only in very unusual circumstances. *See, e.g., INS v. Jong Ha Wang,* 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); *LeBlanc v. INS,* 715 F.2d 685, 688–93 (1st Cir.1983); *In re Acosta-Solorzano,* Interim Decision No. —— (BIA Mar. 1, 1985).

If the INS means only to point out that the Attorney General enjoys broad delegated power to "determine," § 243(h), the facts, and considerable leeway in interpreting the terms of its governing statute (free of judicial interference), we agree. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488–90, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Chevron, U.S.A., Inc. v. National Resources Defense Council,* —— U.S. ——, ——, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). But, if the INS means that the cases it cites reach beyond ordinary principles of administrative law to require a special judicial mood of extraordinary caution in all immigration cases, we do not agree. To be more specific, we do not believe that the cases it cites require so extreme and unusual a judicial attitude when courts review a purely factual determination under the statute now before us.

Even if such cases as *Jong Ha Wang, LeBlanc,* and *Acosta-Solorzano* could be interpreted to call for such an attitude (a matter we need not decide), there is an important difference between the language of the statutes at issue in those cases and the statute at issue here, § 243(h). Section 243(h), unlike the other statutes, does not use terms like "discretion" or the equivalent. Instead, it imposes an express limitation on the Attorney General's power to deport certain classes of aliens physically present in the United States. (See Appendix for texts of relevant statutes.) The statute considered in *Jong Ha Wang* and *LeBlanc* allows the Attorney General to suspend the deportation of aliens for reasons of hardship. It speaks of aliens who "in [his] opinion" are likely to suffer "ex-

treme hardship," and it also says that the Attorney General "may" decide to suspend deportation proceedings "in his discretion." 8 U.S.C. § 1254(a)(1); *see Jong Ha Wang,* 450 U.S. at 144–46, 101 S.Ct. at 1031–32. Likewise, the statute at issue in *Acosta-Solorzano* allows the Attorney General to offer asylum to aliens (including those who are "at a land border or port of entry") who satisfy the Act's definition of a refugee. *See* 8 U.S.C. § 1101(a)(42)(A). It says he "may" do so "in [his] discretion." 8 U.S.C. § 1158(a); *see INS v. Stevic,* —— U.S. ——, 104 S.Ct. 2489, 2497 n. 18, 81 L.Ed.2d 321 (1984); *In re Acosta-Solorzano,* slip op. at 7. Even the statutory predecessor of the statute now before us said, *prior to 1980,* that the Attorney General "is authorized" to withhold deportation of persons who "in his opinion" faced persecution. Former 8 U.S.C. § 1253(h), *repealed by* Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 107.

Section 243(h) as it now stands, however, says that "[t]he Attorney General *shall not* deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened ...." 8 U.S.C. § 1253(h) (emphasis added). The words "shall not" imply a mandatory duty; the objective nature of that duty is emphasized by the removal of the words "in his opinion" from the statute.

The legislative history of this language makes clear that these limitations on the Attorney General's subjective discretion were deliberate. *Compare INS v. Phinpathya,* —— U.S. ——, 104 S.Ct. 584, 592–93, 78 L.Ed.2d 401 (1984). Indeed, the original proposed version of § 243(h) that was before Congress in 1979 would not have changed the language that simply "authorized" the Attorney General to withhold deportation in the appropriate instances. *Refugee Act of 1979: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary,* 96th Cong., 1st Sess. 14–15 (1979). In hearings before Congress, however, several witnesses

urged Congress to make the language of § 243(h) mandatory in order to bring domestic law into conformity with the obligations that the United States had assumed in joining the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968). *See Hearings, supra,* at 181 (testimony of Hurst Hannum) (stating that it was "absolutely essential that [the] language [of § 243(h)] be made mandatory," because the discretionary aspect of § 243(h) was "directly counter to the obligation the United States accepted [under the Protocol]"); *see also id.,* at 169 (statement of A. Whitney Ellsworth). After these hearings, Congress passed an amended version of the bill containing the mandatory language that witnesses claimed the Protocol required. *See* H.R.Rep. No. 608, 96th Cong., 1st Sess. 18 (1979) ("[T]he Committee feels the proposed change in § 243(h) is necessary so that U.S. statutory law clearly reflects our legal obligations under international agreements."). *See generally* Anker & Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980,* 19 San Diego L.Rev. 9, 48–49, 50 n. 202, 56 (1981).

The Protocol, which the United States joined in 1968, requires each signatory to comply with the substantive provisions of the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1951). And one of the key substantive provisions of the Convention, Article 33.1, says:

### PROHIBITION OF EXPULSION OR RETURN

### ("REFOULEMENT")

1. *No* Contracting State *shall* expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

189 U.N.T.S. at 176 (emphasis added). *See* L. Holborn, *Refugees: A Problem of Our Time—The Work of the United Nations High Commissioner for Refugees, 1951– 1972,* at 158 (1975) ("[T]he Convention sets down minimal standards of treatment that *must* be accorded to refugees by states which accept the Convention.") (emphasis added); Office of the United Nations High Commissioner for Refugees, *A Mandate to Protect and Assist Refugees* 34 (1971) (describing Article 33 as "the most important" article of the Convention and one of the few articles concerning which signatories are permitted no qualifications or reservations). This is not to say that Congress, in amending § 243(h), changed the substantive standard that an alien had to meet to entitle him or her to withholding of deportation. *See INS v. Stevic,* 104 S.Ct. at 2500 n. 22. Rather, Congress simply withdrew from the Attorney General the power to withhold § 243(h) relief to those who meet that standard. *Id.* at 2496 n. 15.

In light of this statutory language and history we need not consider the extent to which the cases decided under a different set of immigration statutes require some highly unusual degree of judicial noninterference. Rather, our role is the typical role of a reviewing court considering a typical decision of an administrative agency. The decision in question is the Attorney General's refusal to allow the petitioner a hearing on her claim that she is a 'political' or 'social' refugee entitled to remain in the United States in accordance with the language of § 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). The applicable statutory standard, as interpreted by the Supreme Court, requires the Attorney General to allow a petitioning alien to remain if her "application" is "supported by evidence establishing that *it is more likely than not* that she would be subject to persecution" on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic,* —— U.S. ——, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984) (emphasis added). Our job is to decide whether the Attorney General's refusal to reopen petitioner's deportation proceeding—on the ground that her applica-

tion failed to show that she likely met this standard—was reasonable or whether it was "arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A); *INS v. Rios-Pineda*, —— U.S. ——, ——, 105 S.Ct. 2098, 2101–02, 85 L.Ed.2d 452 (1985); *Holley v. INS*, 727 F.2d 189, 191 (1st Cir.1984). In doing so, we must keep in mind the fact that here no broad policy judgments are at issue. Rather, the Attorney General has made a simple judgment about facts; and we review that judgment with awareness both of the Attorney General's comparative expertise and of the limits of reasonableness that he cannot transgress.

### III

■ Having reviewed the record before us, we conclude that the Attorney General's refusal to reopen the deportation proceeding was an "abuse" of the "discretion" that Congress granted to him in § 243(h) for the following reasons.

First, the petitioner's application complied with the INS's relevant formal and procedural requirements. *See* 8 C.F.R. §§ 3.2, 242.22 (requiring that motions to reopen allege "new facts"—i.e., material evidence that "was not available and could not have been discovered or presented at the former hearing"). The affidavits provided information about political repression in Ghana and its likely adverse consequences for petitioner, describing events in her native Ghana that, in relevant part, had not occurred until after her earlier deportation proceedings had concluded.

Second, petitioner's affidavit alleged specific facts, which "would, if proved, establish eligibility [for relief]," and which therefore made out a "prima facie" case. *Wang v. INS*, 622 F.2d 1341, 1346 (9th Cir.1980) (en banc), *rev'd on other grounds*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981). These facts—the house arrest of her parents, the beating of her nephew, the seizure of the family's bank account, the persecution of petitioner's tribe, social class, and political persuasion, together with the other facts summarized on page 623, *supra*—if true, would show, more probably

than not, that petitioner's "life or freedom would be threatened" in Ghana "on account of ... membership in a social group ...." § 243(h), 8 U.S.C. § 1253(h).

The United Nations High Commissioner for Refugees' *Handbook on Procedures and Criteria for Determining Refugee Status*—a "useful tool" for interpreting the phrase "social group" as it appears in the U.N. Protocol, hence in the statute, *see In re Acosta-Solorzano*, slip op. at 10— states:

A "particular social group" normally comprises persons of similar *background*, habits or *social status*.... Membership of [sic] such a particular social group may be at the root of persecution because there is *no confidence in the group's loyalty to the Government* or because the *political outlook, antecedents* or economic activity of its members, or the very existence of the social group as such, is held to be an obstacle to the Government's policies.

¶¶ 77–78, at 19 (1979) (emphasis added). *See also Zavala-Bonilla v. INS*, 730 F.2d 562, 567 (9th Cir.1984) ("The *Handbook* has been treated by the [Board] as a significant source of guidance with respect to the United Nations Protocol ..."); *Stevic v. Sava*, 678 F.2d 401, 406 n. 8, 409 (2d Cir. 1982) *rev'd on other grounds sub nom. INS v. Stevic*, —— U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). The alleged facts bring petitioner squarely within this definition. They also show that the threat of persecution arises out of characteristics that are essentially beyond the petitioner's power to change. *See In re Acosta-Solorzano*, slip op. at 24 ("social group" persecution must be based on "a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed") (citing 1 A. Grahl-Madsen, *The Status of Refugees in International Law* 217 (1966); G. Goodwin-Gill, *The Refugee in International Law* 30 (1983) ).

The facts alleged here indicate more than a general "political upheaval" that affects "the populace as a whole." *In re Mar-*

*tinez-Romero*, Interim Decision No. 2872 (BIA 1981), *aff'd* 692 F.2d 595 (9th Cir. 1982). Rather, they show a specific threat to the petitioner. The Board and the courts of appeals have consistently recognized evidence about treatment of one's family as probative of such a threat. *See, e.g., Chavez v. INS*, 723 F.2d 1431, 1434 (9th Cir.1984); *Chavarria v. INS*, 722 F.2d 666, 668 (11th Cir.1984); *Sanchez v. INS*, 707 F.2d 1523, 1527–28 (D.C.Cir.1983); *Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir.1983); *Fleurinor v. INS*, 585 F.2d 129, 134 (5th Cir.1978); *In re Martinez-Romero*, slip op. at 79; *see also Handbook, supra*, ¶ 43, at 13 (threat of persecution "need not be based on the applicant's own personal experience.... [Evidence concerning] relatives and other members of the same racial or social group may well show that his fear ... of persecution is well founded."). And, the facts of house arrest and beating make this case a stronger one than those cited here by the INS, in which a refusal to reopen deportation proceedings has been found proper.

In *Shoaee v. INS, supra*, the government's strongest supporting authority, the petitioner alleged that he had spoken out against the new Iranian government which had taken away his father's civil service pension, deprived his brother of a government banking job, and refused to allow his brother to travel to the United States for heart surgery. The court characterized this evidence as showing a "decline" in the "family's political fortunes," not persecution. But the petitioner in *Shoaee* lacked the evidence of house arrest and a beating, two facts which more directly show a threat to "life or freedom." The other cases the INS cites offer it still less support. *See Chavarria v. United States Department of Justice*, 722 F.2d 666 (11th Cir.1984) (rejecting petitioner's claim that he would be subject to persecution if returned to Nicaragua because he worked in a firm that was out of favor with the government, where evidence showed that he had worked for the company uneventfully for two years after it first became a target for attack); *Chavez v. INS*, 723 F.2d

1431 (9th Cir.1984) (rejecting § 243(h) application of petitioner who alleged threats, a suspicious accident, and the death of a coworker, but failed to show that these incidents were clearly related to petitioner's political views or membership in a defined social group); *Minwalla v. INS*, 706 F.2d 831 (8th Cir.1983) (rejecting petition of Zoroastrian who alleged that new government in Pakistan would deny him government employment because of his religion, noting that "mere economic detriment is not enough" to warrant § 243(h) relief); *Sanchez v. INS*, 707 F.2d 1523 (D.C.Cir.1983) (rejecting application of Salvadoran who believed that he would be targeted for persecution if returned to El Salvador because of statements that he had made in support of the Christian Democrats there, but who failed to put forward evidence showing that he would be singled out for persecution because of these statements). Indeed, the present case seems a stronger one for petitioner than *Samimi v. INS*, 714 F.2d 992 (9th Cir.1983), in which the Ninth Circuit required a reopening on the basis of a petitioner's allegations that the new Iranian government had seized his father's land and forbade his father to work because of the family's ties to the wife of the former Shah.

■ In sum, we recognize the need to require an alien who seeks § 243(h) relief to offer reasonably specific information showing a real threat of individual persecution. Otherwise, given the unfortunately large number of repressive governments throughout the world, Congress's offer of continued haven to refugees present in the United States could severely weaken its more general legislative effort to impose overall limitations upon immigration. Nonetheless, we believe that the facts alleged here, if true, make out the very sort of threat that Congress intended as a predicate for continued refuge.

Third, the sources of information upon which petitioner relies to prove the facts that she alleges are sufficiently credible to warrant further administrative proceedings. Petitioner submitted, in support of

her motion to reopen, a sworn statement by an academic expert on African politics, as well as newspaper accounts and magazine articles—one of which claimed that, while "there is no consistent pattern apparently in the choice of [individual] victims," the new government in Ghana has instituted a campaign of repression and terror against the "property [sic] and managerial class" as a whole. "Ghana: reign of terror," *Africa Now,* Dec. 1982, at 11. In addition, the petitioner submitted her own sworn statement—based on her own knowledge and information obtained in telephone conversations that she had with a third party—to show the specific facts about her family's connections with the former government and her family's current situation. These evidentiary sources are at least trustworthy enough to be admissible and reasonably credible as evidence in an administrative proceeding. Indeed, unless an alien were allowed to rely upon such sources, it is difficult to see how he or she could make out a case of political or social repression in a distant land. *See Bolanos-Hernandez v. INS,* 749 F.2d 1316, 1324 (9th Cir.1985) ("If the alien's own testimony about a threat, when unrefuted and credible, were insufficient to establish the fact that the threat was made, it would be 'close to impossible for [any political refugee] to make out a § 243(h) case.' ") (citation omitted); United Nations High Commissioner for Refugees, *Handbook, supra,* ¶ 196, at 47 (1979); *cf.* Note, *Developments in the Law—Immigration Policy and the Rights of Aliens,* 96 Harv.L.Rev. 1286, 1355 (1983). To offer refuge to those faced with genuine threats of persecution but to forbid them to offer journalistic accounts, expert opinions, and third-party reports in their efforts to prove it would simply "sound the word of promise to the ear but break it to the hope."

Of course, the INS remains free to dispute the veracity of this information, the significance of the specific facts it indicates, and the authority of the sources. The INS can introduce conflicting evidence casting doubt upon the petitioner's allegations. But, here the sources are sufficiently reliable, at least, to warrant administrative consideration, and the facts they set forth are sufficient, in the absence of contrary or conflicting information, to allow relief.

Fourth, the objections that the Board has raised to petitioner's affidavits are of a sort that are best considered at a hearing, or at least after a reopening, for in each instance their significance depends upon the strength of petitioner's reply. The Board says, for example, that petitioner's affidavit does not say whether the beating of her nephew was politically motivated. And, it adds that the affidavit gives few details about her parents' house arrest. Petitioner, however, may not have more specific information; or she may not have felt it essential to include more specific information in her affidavit. The surrounding facts make the inferences of politically motivated house arrest and beatings plausible. The absence of more specific information, given petitioner's distance from home and the likely difficulty of communication, certainly does not refute petitioner's factual claims on their face.

The Board makes an additional and particular point of the fact that petitioner says she received one letter from her father in February, 1983, but she does not state in her affidavit precisely what the letter said. The INS infers that the letter does not mention the house arrest from the fact that petitioner says she learned of it from a third person; and the Board also infers, from petitioner's silence, that the letter would reflect unfavorably upon her claim. We do not see, however, exactly what should be made, at this point, from petitioner's failure to include the letter. Perhaps it was an oversight; perhaps her father was afraid to say what happened to him; perhaps the Ghanaian government censors outgoing letters. *Compare Zavala-Bonilla v. INS,* 730 F.2d 562, 565 (9th Cir.1984); *McMullen v. INS,* 658 F.2d 1312, 1319 (9th Cir.1981). These sorts of questions are precisely those that ought to be explored at a hearing. They do not excuse

the Board's failure to supply one. *See, e.g., Luna v. INS*, 709 F.2d 126 (1st Cir.1983); *Reyes v. INS*, 673 F.2d 1087 (9th Cir.1982); *cf. Fernandez-Roque v. Smith*, 599 F.Supp. 1103, 1107 (N.D.Ga.1984).

Finally, we note the existence of important cases referring to the Board's broad discretionary power to decide when to reopen a deportation proceeding. Those statements, however, were made in a significantly different legal context—namely, a motion to reopen for consideration of a petitioner's claim for *discretionary* relief. *See INS v. Wang*, 450 U.S. at 143–44 n. 5, 101 S.Ct. at 1030–31 n. 5 (indicating that INS's decision to reopen, in context of § 244 "hardship" petitions, is discretionary); *INS v. Phinpathya*, 104 S.Ct. at 589 n. 6 (following *Wang*); *INS v. Rios-Pineda*, —— U.S. at ——, 105 S.Ct. at 2101–02 (same). In any case, the Board's dismissal of petitioner's case rests not upon such discretionary authority nor upon any policy related to reopenings. Rather, it rests upon an explicit holding that petitioner did not make out a prima facie case that she falls within the statute's specific terms. For the reasons stated, we find that this holding was in error; and, because the Board's decision rests upon a legally erroneous conclusion, we must vacate that decision and remand for reconsideration. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93–95, 63 S.Ct. 454, 461–62, 87 L.Ed. 626 (1943).

For these reasons, the order of the Board of Immigration Appeals denying the petitioner's motion to reopen is *vacated* and the case *remanded* to the Board for further proceedings consistent with this opinion.

LEVIN H. CAMPBELL, Chief Judge (concurring and dissenting).

I would be prepared to go along with my colleagues were they simply of the view that petitioner's factual showing had been sufficiently suggestive of personal danger to justify a hearing. While I do not agree that the facts petitioner presented would, by themselves, necessarily require the Attorney General to grant asylum under 8 U.S.C. § 1253(h), they are more specific and serious than those presented in a number of other cases where courts have refused to order a hearing. Fairness may dictate a fuller examination into petitioner's status.

But I cannot and do not accept my colleagues' sweeping and extensive proposed reordering of the legal principles governing a case of this sort. In particular, I disagree with their casting by the board of the Supreme Court's precedents conferring broad discretion upon the Attorney General in these matters. Rather than rejecting the notion of a "special judicial mood of extraordinary caution" in immigration cases, I find much to be said for such an approach. I believe the determination section 243(h) requires the Attorney General to make—whether an alien's "life or freedom" would be threatened for a number of reasons if he or she is deported—remains largely within the discretion of the Attorney General, not with the court. It is hard for me to see how courts have the knowledge and expertise to play a major role in such rulings. There are far too many variables to be assessed; it seems to me only sensible that the executive branch, which is more sensitive to foreign policy considerations and to the overall status of immigration policy, should take the laboring oar.

I therefore dissent from the court's reasoning, and in particular from its analysis and, as I see it, departure from the principles which should control in this area.

## APPENDIX

**8 U.S.C. § 1158. Asylum procedure**
**(a) Establishment by Attorney General; coverage**

The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

APPENDIX—Continued

[§ 1101(a)(42)

The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. ....]

**Former 8 U.S.C. § 1253(h),** *repealed by* Refugee Act of 1980

### Withholding of deportation

The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

**8 U.S.C. § 1253**

**(h) Withholding of deportation or return**

(1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(19) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

**8 U.S.C. § 1254. Suspension of deportation**

**(a) Adjustment of status for permanent residence; contents**

As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien (other than that of an alien described in section 1251(a)(19) of this title) who applies to the Attorney General for suspension of deportation and—

(1) is deportable under any law of the United States except the provisions specified in· paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence; or ....