**Rahim SAKHAVAT, Petitioner,**

**v.**

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 85–7244.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1986.

Decided Aug. 14, 1986.

Gary Silbiger, Silbiger & Honig, Los Angeles, Cal., for petitioner.

Lawrence W. Chamblee, Linda B. Adams, Los Angeles, Cal., for respondent.

Before FARRIS, PREGERSON and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

Rahim Sakhavat appeals the decision of the Board of Immigration Appeals (BIA) denying his motion to reopen deportation proceedings to apply for withholding of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) (1982 & Supp. II 1984), and for asylum under section 208(a), 8 U.S.C. § 1158(a).

I

At his original deportation proceeding in February, 1981, Sakhavat, an Iranian citizen, did not request asylum but contested his deportability as an overstay on legal grounds that were rejected by the BIA. Sakhavat then filed but did not press an appeal to this court. Instead, he dropped out of sight, failed to report for his scheduled deportation, and was not further traced until the Immigration and Naturali-

zation Service (INS) detained him in San Diego in March, 1985. At that point, Sakhavat moved to reopen his deportation proceeding to apply for asylum and withholding of deportation. In support of his motion, Sakhavat submitted affidavits and other evidence, such as letters, photographs, and newspaper reports. The evidence showed that since July, 1981 the Khomeini regime has rounded up, tortured, and killed members of the opposition Mojahedin party—including Sakhavat's brother—and that as a vocal supporter of the Mojahedin Sakhavat has been the target of violence and intimidation from pro-Khomeini students.

The withholding of deportation provision, 8 U.S.C. § 1253(h), prohibits the Attorney General from deporting an alien to any country if the alien establishes that he would "more likely than not ... be subject to persecution" upon his return. *INS v. Stevic,* 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984). Relief is mandatory if the alien meets this standard. *See Aviles-Torres v. INS,* 790 F.2d 1433, 1436 (9th Cir.1986) ("[t]he Board has no discretion if the alien proves his claim"); *Espinoza-Martinez v. INS,* 754 F.2d 1536, 1539 (9th Cir.1985). In contrast, the standard for a discretionary grant of asylum under section 208(a) is less stringent, *Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1283 (9th Cir.1984): the applicant need show only "a well-founded fear of persecution," 8 U.S.C. § 1101(a)(42)(A), by pointing to "specific, objective facts that support an inference of past persecution or risk of future persecution." *Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1453 (9th Cir.1985), *cert. granted,* — U.S. —, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986). Under the lesser standard, threshold eligibility does not entitle the alien to relief, *id.* at 1451–52, for the BIA retains discretion to deny asylum if it articulates negative factors present in the application that are based on valid immigration-law concerns. *Aviles-Torres,*

790 F.2d at 1437; *Hernandez-Ortiz v. INS,* 777 F.2d 509, 519 (9th Cir.1985).

To justify reopening, an alien must make a prima facie showing that he is eligible for relief. *INS v. Wang,* 450 U.S. 139, 141, 101 S.Ct. 1027, 1029, 67 L.Ed.2d 123 (1981). "A prima facie case is established when an alien presents 'affidavits *or* other evidentiary material,' 8 C.F.R. § 103.5 (1985), which, if true, would satisfy the requirements for substantive relief." *Hernandez-Ortiz,* 777 F.2d at 513 (emphasis in original); *see also Larimi v. INS,* 782 F.2d 1494, 1496 (9th Cir.1986). For purposes of the alien's motion to reopen, the BIA must accept the truth of his affidavits "unless it finds [the facts asserted] to be 'inherently unbelievable.'" *Maroufi v. INS,* 772 F.2d 597, 600 (9th Cir.1985), *quoting Hamid v. INS,* 648 F.2d 635, 637 (9th Cir.1981); *see also Hernandez-Ortiz,* 777 F.2d at 512 n. 2 & 514; *Aviles-Torres,* 790 F.2d at 1436. Moreover, the BIA "cannot make credibility determinations at this stage of the proceedings." *Hernandez-Ortiz,* 777 F.2d at 518; *see also Reyes v. INS,* 673 F.2d 1087, 1089–90 (9th Cir.1982).

The BIA denied Sakhavat's motion to reopen for two reasons: first, it ruled that the motion did not "reasonably explain" Sakhavat's failure to request asylum at his initial hearing, in violation of 8 C.F.R. § 208.11 (1985)[1]; second, the BIA ruled that Sakhavat had failed to make a prima facie case for relief because irreconcilable inconsistencies undermined the credibility of his supporting materials. We review the BIA's denial of his motion to reopen for an abuse of discretion. *INS v. Rios-Pineda,* — U.S. —, 105 S.Ct. 2098, 2101–02, 85 L.Ed.2d 452 (1985); *Maroufi,* 772 F.2d at 600.

## II

Sakhavat's evidence tells the following story. Born in Iran to a middle-class fami-

---

1. INS regulations require that an alien's motion to reopen "reasonably explain the failure to request asylum prior to the completion of the exclusion or deportation proceeding. If the alien fails to do so, the asylum claim shall be considered frivolous, absent any evidence to the contrary." 8 C.F.R. § 208.11.

ly, Sakhavat first came to the United States to study engineering in 1978. Although he was a Mojahedin and was beaten by Khomeini's personal guards during a brief visit home in 1979, Sakhavat supported the revolution at the time of his initial deportation proceeding. In July, 1981, the Mojahedin leader—a one-time moderate ally of Khomeini—was forced into exile, and Khomeini launched draconian steps to consolidate his power, including a systematic purge of Mojahedin elements. His loyalty to his suppressed party turned Sakhavat against Khomeini and prompted him to join in anti-Khomeini demonstrations at Fresno State University, where he was then enrolled as a student. One such demonstration, in midsummer of 1981, turned into a clash between pro-Khomeini and dissident students, and Sakhavat was beaten with bats and chains. Later the same month, pro-Khomeini students chased him and, when he took refuge in his car, vandalized it.[2] Finally, while Sakhavat was spending a semester at Baton Rouge State University in Louisiana, the evidence shows that a band of pro-Khomeini students became aware of his opposition to the regime, confronted and attacked him.

Sakhavat's evidence further tends to prove that his family in Iran has suffered because of its opposition to Khomeini. In 1982, Sakhavat's father was beaten, jailed for two weeks, threatened with death, and ordered to stop his sons' protest activity. In January 1983, Sakhavat's brother Nassir was executed shortly after his imprisonment on political charges. The other two brothers at once went into hiding and have remained underground. Finally, in the same letter that reported Nassir's death, Sakhavat's father warned him that security forces had come to the house in search of his whereabouts and implored him not to risk his life by returning to Iran.[3]

The BIA ruled that Sakhavat's proffered evidence was undermined by inconsistencies and thus fell short of a prima facie showing. First, the BIA found that Sakhavat's claimed support for the revolution through July, 1981 could not be squared with an unsworn, unsigned "biography" submitted with his application, which dated his disaffection with Khomeini from the time of his return to Iran in 1979. Second, the BIA found that Sakhavat's involvement in the melee at Fresno State was belied by an exculpatory account he gave to school authorities at the time. Finally, discerning ambiguity in the father's letter, the BIA speculated that Nassir may have died in the Iran-Iraq war—not as the victim of domestic persecution.

### III

■ Having examined the record as a whole, we hold that "[t]he BIA abused its discretion ... when it disbelieved affidavit evidence that was not inherently incredible." *Mattis v. INS*, 774 F.2d 965, 969 (9th Cir.1985). At the motion to reopen stage, our precedents restrict the BIA to evaluating whether Sakhavat's affidavits on their face cumulatively establish a clear probability that he will face persecution in Iran.

2. The existence of, as well as Sakhavat's visible part in, anti-Khomeini altercations at Fresno State is confirmed by photographs, news reports, and letters from university officials, other Iranian students, and the local police.

3. Sakhavat submitted an authenticated translation of his father's letter in support of his motion to reopen. If credited, the letter leaves no doubt that the brother was put to death for his political activities: "Your brother became a martyr in the hands of the blood thirsty regime of Khomeini for Iran's freedom. I hope that your brother's martyrdom achieves the freedom and independence of Iran.... These dishonorable people show mercy to no one." Moreover, journalistic pieces that Sakhavat also submitted bolstered the father's account because Nassir's death reportedly coincided with increased executions of detained political prisoners—sanitizing the jails on the eve of a factfinding visit by human rights observers.

Despite the letter's clear, poignant meaning, and its convergence with independent news accounts, the BIA concluded that it was open to another interpretation: "respondent's brother died in the war with Iraq, ... his brothers have gone into hiding to escape the draft and ... those who came to his father's house were inquiring about the respondent for the purpose of registering him for the draft." This starkly illustrates the BIA's crabbed evaluation of Sakhavat's evidence. *See* Part III, *infra*.

*See, e.g., Maroufi,* 772 F.2d at 600. Here, the BIA departed from these precedents, and from the limited screening function of a motion to reopen, *Reyes,* 673 F.2d at 1089, by either ignoring or prematurely discrediting key elements of Sakhavat's prima facie case. The BIA nit-picked the record to unearth illusory inconsistencies,[4] focused on peripheral material (like the unauthorized Sakhavat "biography," submitted by well-meaning but ill-informed friends while Sakhavat was in detention), and distorted the political meaning of Nassir's death. If believed, the evidence that Sakhavat marshalled explains his failure to make a timely asylum request in February, 1981, for at that time he still supported the revolution and the Mojahedin had yet to suffer systematic persecution. His evidence also makes a compelling prima facie showing that he is likely to be persecuted as a Mojahedin if returned to Iran.[5] He thus established a prima facie claim for withholding of deportation, and the BIA abused its discretion in finding otherwise.

### IV

By meeting the prima facie requirements for withholding of deportation under section 243(h), Sakhavat has *a fortiori* established his prima facie eligibility for a grant of asylum under the more generous standard of section 208(a). *See Bolanos-Hernandez,* 767 F.2d at 1288. Accordingly, on remand, the BIA must consider whether he is eligible for asylum and, absent negative factors legitimately rooted in immigration-law enforcement, *Aviles-Torres,* 790 F.2d at 1437, deserving of a discretionary grant of relief.

In sum, we hold that the BIA abused its discretion when it determined that Sakhavat failed to establish a prima facie case for relief under both section 243(h) and section 208(a). Accordingly, we reverse this determination and remand to the BIA for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

4. For instance, the record indicates that several clashes between polarized Iranian students took place on the Fresno State campus during July, 1981. Sakhavat's exoneration from disciplinary charges arising from one incident hardly contradicts his claim that he took part in others, especially when this claim is borne out by official reports.

5. This case is distinguishable on its facts from several recent cases in which we upheld the denial of motions to reopen to apply for withholding relief filed by Iranian students. In *Maroufi v. INS,* 772 F.2d 597 (9th Cir.1985), the petitioner based his claim of persecution on "generalized events" in Iran, *id.* at 599, not on his own experience as a dissident or specific violence inflicted on members of his family. *See Argueta v. INS,* 759 F.2d 1395, 1397 (9th Cir.1985) (finding evidence of violence to a family member relevant to a withholding claim). In *Larimi v. INS,* 782 F.2d 1494 (9th Cir.1986), the petitioner alleged only a "casual affiliation with the Mojahedin," *id.* at 1497, and had suffered no violence as a consequence of that affil-

iation. Finally, in *Kaveh-Haghigy v. INS,* 783 F.2d 1321 (9th Cir.1986), the petitioners, two apparently apolitical students, claimed only that their youth might subject them to conscription and that their extended residence in the United States might expose them to anti-American retaliation upon their return. *Id.* at 1323. Consequently, they established neither the persecuted political identity nor the specific acts of violence and intimidation that distinguish Sakhavat's case. We believe that this case is closer to *Samimi v. INS,* 714 F.2d 992 (9th Cir.1983), where we held that the expropriation of the father's landholdings in Iran, the family's mass exodus to sanctuary in Europe, and Samimi's "traitorous" public statements while in this country combined to "raise a ... serious question concerning Samimi's fate." *Id.* at 995.