**Luis Alonzo SANCHEZ–TRUJILLO, and Luis Armando Escobar-Nieto, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 85–7609.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 11, 1986.

Decided Oct. 15, 1986.

Marc Van Der Hout, San Francisco, Cal., Carolyn Patty Blum, Berkeley, Cal., for petitioners.

Ellen Lutz, Aclu Foundation of Southern Cal., Los Angeles, Cal., amicus curiae, for ACLU Foundation of Northern & Southern Cal., & Nat. Lawyers Guild, Seattle, Chapter.

Lauri Steven Filppu, Deputy Director, Joan E. Smiley, Atty., Dept. of Justice, Washington, D.C., for respondent.

Before CHOY, ALARCON and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Petitioners, Luis Alonzo Sanchez-Trujillo and Luis Armando Escobar-Nieto, citizens of El Salvador who entered the United States without inspection, applied for asylum and prohibition of deportation. They petition for review of a final order of the Board of Immigration Appeals ("BIA") denying their requests for relief from deportation on account of their membership in a purportedly persecuted social group of young, working class males who have not served in the military of El Salvador. The BIA also denied their claims based upon individual allegations of persecution on account of actual or imputed political opinion. We affirm the decision of the BIA, and deny the petition for review.

# I

## BACKGROUND

The Immigration & Naturalization Service ("INS") instituted deportation proceedings against Sanchez and Escobar in June, 1980, and October, 1980, respectively,

charging them with entry into the United States without inspection in violation of 8 U.S.C. § 1251(a)(2). At their joint deportation hearing commencing April 12, 1982, both petitioners conceded deportability but indicated a desire to apply for asylum as refugees under 8 U.S.C. § 1158(a).[1]

The petitioners maintained that they were entitled to asylum and prohibition of deportation because they feared persecution as members of a "particular social group" consisting of young, urban, working class males of military age who had never served in the military or otherwise expressed support for the government of El Salvador. In his decision rendered September 7, 1982, the Immigration Judge ("IJ") found that such a large division of the population did not constitute a cognizable "social group" within the meaning of 8 U.S.C. §§ 1101(a)(42)(A), 1253(h). Moreover, he concluded that mere group membership, without evidence of persecution directed at the individual petitioner, was not sufficient to maintain a claim for asylum or prohibition of deportation.

In addition to his group membership claim, Sanchez alleged a fear of individual persecution based upon actual or imputed political opinion.[2] He testified that on four occasions, he, along with several others, had been briefly detained by government security officers to be searched for weapons and to inspect documents. These incidents did not result in any arrests. Sanchez had also been a member of a Catholic youth organization. Following demonstrations near the church, the priest who led the organization disappeared for a month and returned with bruises on his face. Finally, after his entry into the United States, Sanchez was briefly associated with an organization which protested conditions in El Salvador.

Escobar maintained a claim for relief from deportation by alleging a fear of persecution based upon political opinion. He testified that on one occasion, he had been attacked at night upon the streets of San Salvador by men traveling in a vehicle with government license plates. He was beaten and robbed, but then released. There was no apparent motive for the attack. In addition, he had been present at two demonstrations which had been violently dispersed by government security forces, although Escobar was not involved in the violence.

The IJ concluded that Sanchez and Escobar had failed to present sufficient evidence to establish a claim for asylum or prohibition of deportation based upon a fear that they would be singled out for persecution upon deportation.

On October 15, 1985, the Board of Immigration Appeals ("BIA") affirmed the IJ's findings, holding that status as a young, urban, working class male without military service did not constitute membership in a "particular social group" under the applicable statutes. The BIA further concluded that neither petitioner had established a "well-founded fear" of persecution to be eligible for asylum under 8 U.S.C. § 1158(a) or a "clear probability of persecution" to warrant prohibition of deportation under 8 U.S.C. § 1253(h). The BIA granted thirty days to the petitioners for voluntary departure.

Sanchez and Escobar seek review in this court of the BIA's decision as a final order of deportation under 8 U.S.C. § 1105a.

## II

## PERSECUTION BASED UPON SOCIAL GROUP MEMBERSHIP

### A. *Refugee Status Based Solely on Group Membership*

An alien who can demonstrate that his individual circumstances present a "clear

---

1. "All requests for political asylum are also considered applications for withholding of deportation pursuant to 8 U.S.C. § 1253(h)." *Aviles-Torres v. Immigration and Naturalization Service,* 790 F.2d 1433, 1435 (9th Cir.1986); *see also* 8 C.F.R. § 208.3(b).

2. Sanchez initially alleged persecution based upon religious belief, on account of his membership in a Catholic youth organization. He did not pursue this claim upon appeal to the BIA, and thus may not maintain it before this court.

probability" or a "well-founded fear" of persecution based upon one of five statutory factors, "race, religion, nationality, membership in a particular social group, or political opinion," is eligible for prohibition of deportation or a discretionary grant of asylum. *See* 8 U.S.C. §§ 1253(h), 1101(a)(42)(A). Ordinarily, an alien must establish, through specific, direct, and concrete evidence, that he personally would be singled out for persecution on account of one of these statutory factors, or that there is a reasonable possibility of such persecution.

Some commentators have also contended that eligibility for asylum and prohibition of deportation may be premised solely upon the alien's membership in a racial, religious, ethnic, or social group which has been targeted for persecution. *See, e.g.,* Helton, *Persecution on Account of Membership in a Social Group as a Basis for Refugee Status*, 15 Colum.Hum.Rts.L.Rev. 39 (1983); Blum, *The Ninth Circuit and the Protection of Asylum Seekers Since the Passage of the Refugee Act of 1980*, 23 San Diego L.Rev. 327, 353 (1986). The petitioners' principal claim for relief in this case is based upon the theory that they are representatives of an identifiable "social group" of young, urban, working class males of military age who have never served in the military or otherwise expressed support for the government. Since members of this "particular social group" are allegedly targeted for persecution as a class by the government of El Salvador, the petitioners claim their membership in this group is sufficient in itself to establish their eligibility for relief.

Although no court has directly addressed this point, we previously have strongly indicated that, under the proper circumstances, a claim of persecution premised solely upon group membership could be maintained. In *Hernandez-Ortiz v. INS*, 777 F.2d 509 (9th Cir.1985), we noted that a previous decision should not be read to suggest—

> that membership in a persecuted group is insufficient in itself to require a finding of eligibility for asylum or an order pro-

hibiting deportation. Such a suggestion would squarely contradict history. Few could doubt, for example, that any Jew fleeing Nazi Germany in the 1930's or 40's would by virtue of his or her religious status alone have established a clear probability of persecution.

*Id.* at 515–16 n. 6 (citation omitted).

Still, the claim made by the petitioners in this case, that of persecution based upon status as young urban males who have maintained political neutrality in El Salvador, has been repeatedly rejected by this court. *See, e.g., Zepeda-Melendez v. INS,* 741 F.2d 285, 290 (9th Cir.1984) (alien's "status as a young urban male unallied with either faction" in El Salvador was "not specific enough for political asylum"); *Chavez v. INS,* 723 F.2d 1431, 1434 (9th Cir.1984) (alien's "status as a 'young urban male' is not specific enough for asylum"); *see also Vides-Vides v. INS,* 783 F.2d 1463, 1467 (9th Cir.1986) (quoting *Chavez,* 723 F.2d at 1434).

The petitioners argue that these previous decisions are distinguishable because the aliens in those cases failed to present specific proof that the identified social group was indeed targeted for persecution by authorities in El Salvador. In contrast, the petitioners in this case submitted considerable evidence, through numerous witnesses and exhibits, in support of their claims for asylum and prohibition of deportation based upon group membership. It does appear that the aliens in our previous cases failed to proffer any evidence in support of their claims. Consequently, those decisions cannot be read to have conclusively resolved the issue raised by these petitioners in the instant case.

In determining whether the petitioners have established eligibility for relief premised upon group membership, four questions must be answered. First, we must decide whether the class of people identified by the petitioners is cognizable as a "particular social group" under the immigration statutes. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1253(h). Second, the petitioners must have established that they

qualify as members of the group.[3] Third, it must be determined whether the purported "social group" has in fact been targeted for persecution on account of the characteristics of the group members. Finally, we must consider whether such "special circumstances" are present to warrant us in regarding mere membership in that "social group" as constituting per se eligibility for asylum or prohibition of deportation.[4] *See Chavez,* 723 F.2d at 1434 (quoting *Martinez-Romero v. INS,* 692 F.2d 595, 595–96 (9th Cir.1982)).

### B. Cognizability as a "Particular Social Group"

■ The threshold question is whether the petitioners' class of young, urban, working class males constitutes that type of "particular social group," membership in which should be regarded as indicative of refugee status under the applicable immigration statutes.

The term "particular social group," originated in the United Nations Protocal Relating to the Status of Refugees, *done* January 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.[5] The United States ratified the Protocol on October 4, 1968. 114 Cong.Rec. 29,607 (1968). With the enactment of the Refugee Act of 1980, Congress added to the immigration laws a definition of "refugee"—which includes fear of persecution on account of membership in a "particular social group"—that conforms with the definition provided in the Protocol. *See* Pub.L. No. 96–212, title II, § 201(a), 94 Stat. 102, 102–03 (1980) (codified at 8 U.S.C. § 1101(a)(42)(A)); Pub.L. No. 96–212, title II, § 203(e), 94 Stat. 102, 107 (1980) (codified at 8 U.S.C. § 1253(h)); *see also* S.Rep. No. 256, 96th Cong., 1st Sess. 4, 14–15 (1979), *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 144, 154–55; H.R.Rep. No. 608, 96th Cong., 1st Sess. 17–18; *see generally Stevic v. INS,* 467 U.S. 407, 421 & n. 14, 104 S.Ct. 2489, 2496 & n. 14, 81 L.Ed.2d 321 (1984).

Since the statutory definition of "refugee" derives from an international Protocol, and because the legislative history is generally uninformative on this point,[6] we

---

3. Although both petitioners qualified as members of this purported "social group" at the time of the hearing before the IJ, petitioner Sanchez is now 33 years of age. The petitioners have characterized the class as limited to young males of military age, i.e., between the ages of 18 and 30. At present, Sanchez would be excluded from this classification. As we decide this case on other grounds, it is not necessary to determine whether "social group" membership should be regarded as conclusively established as of the time of the deportation hearing.

4. The "special circumstances" requirement apparently derives from subparagraph 79 of the *Handbook on Procedures and Criteria for Determining Refugee Status* (1979), promulgated by the United Nations High Commissioner for Refugees. This subparagraph provides:

    Mere membership in a particular social group will not normally be enough to substantiate a claim to refugee status. There may, however, be *special circumstances* where mere membership can be a sufficient ground to fear persecution.

    (Emphasis added).
    As we conclude that the petitioners have failed to identify a cognizable "social group" or sustain their burden of proof, we need not further define the contours of the "special circumstances" requirement.

5. Article 1.2 of the Protocol defines a "refugee" as an individual who—

    "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a *particular social group* or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protections of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it."

6. There is also a dearth of judicial authority construing the meaning of "particular social group." In *Ananeh-Firempong v. INS,* 766 F.2d 621, 626 (1st Cir.1985), the First Circuit regarded persecution by Ghana authorities of a particular tribe, those associated with the former government, and professionals, business people, and those who were highly educated as persecution of a "social group" within the meaning of 8 U.S.C. § 1253(h). The court held these were "characteristics that are essentially beyond the petitioner's power to change." *Id.*

    Whatever the merits of the First Circuit's decision under the circumstances of that case, the decision provides no guidance as to the outer limits of the "social group" category.

have often looked to sources of international law for guidance in applying the asylum and prohibition of deportation provisions of the Refugee Act. In particular, we have acknowledged the *Handbook on Procedures and Criteria for Determining Refugee Status,* promulgated by the United Nations High Commissioner for Refugees, as a "significant source of guidance with respect to the United Nations Protocol." *Zavala-Bonilla v. INS,* 730 F.2d 562, 567 (9th Cir.1986); *see also Hernandez-Ortiz,* 777 F.2d at 567 n. 7.

Unfortunately, the *Handbook* provides little assistance in arriving at a workable definition of "particular social group." The *Handbook* does not define this term other than to say that a "particular social group" "normally comprises persons of similar background, habits or social status." Subparagraph 77. The *Handbook* does caution that "mere membership in a particular social group will not normally be enough to substantiate a claim to refugee status," absent the existence of "special circumstances." Subparagraph 79. What constitutes those "special circumstances" upon which mere membership would be a sufficient ground to fear persecution is not explained.

Consequently, our interpretation of the phrase "particular social group" must be informed primarily through a careful evaluation of the statutory language, and a practical appreciation of the reasonably limited scope of the term "refugee" as reflected in our previous decisions. We may agree that the "social group" category is a flexible one which extends broadly to encompass many groups who do not otherwise fall within the other categories of race, nationality, religion, or political opinion. Still, the scope of the term cannot be without some outer limit.

The statutory words "particular" and "social" which modify "group," 8 U.S.C. §§ 1101(a)(42)(A), 1253(h), indicate that the term does not encompass every broadly defined segment of a population, even if a certain demographic division does have some statistical relevance. Instead, the phrase *"particular social group"* implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest. Of central concern is the existence of a voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group.[7]

Perhaps a prototypical example of a "particular social group" would consist of the immediate members of a certain family, the family being a focus of fundamental affiliational concerns and common interests for most people. In *Hernandez-Ortiz,* 777 F.2d at 516, we regarded evidence of persecution directed against a family unit as relevant in determining refugee status, noting that a family was "a small, readily identifiable group." As a contrasting example, a statistical group of males taller than six feet would not constitute a "particular social group" under any reasonable construction of the statutory term, even if individuals with such characteristics could be shown to be at greater risk of persecution than the general population.

Likewise, the class of young, working class, urban males of military age does not exemplify the type of "social group" for

---

7. We do not mean to suggest that a persecutor's perception of a segment of a society as a "social group" will invariably be irrelevant to this analysis. But neither would such an outside characterization be conclusive. The Refugee Act did not comprehend "refugee" status for everyone who fears adverse treatment by a foreign government, but only when the fear of persecution is on account of "race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. §§ 1101(a)(42)(A), 1253(h). For example, an individual who fears persecution because of a personal dispute with a foreign government official is not entitled to "refugee" status, as the anticipated mistreatment would not be on account of "political opinion" as required by the statute. *Zayas-Marini v. INS,* 785 F.2d 801, 805–07 (9th Cir.1986). Likewise, what constitutes a "particular social group," as opposed to a mere demographic division of the population, must be independently determined through the application of the statutory term in a particular context.

which the immigration laws provide protection from persecution. Individuals falling within the parameters of this sweeping demographic division naturally manifest a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings. As the IJ said in his written decision, "This [class of young, working class, urban males] may be so broad and encompass so many variables that to recognize any person who might conceivably establish that he was a member of this class is entitled to asylum or withholding of deportation would render the definition of 'refugee' meaningless."

In sum, such an all-encompassing grouping as the petitioners identify simply is not that type of cohesive, homogeneous group to which we believe the term "particular social group" was intended to apply. Major segments of the population of an embattled nation, even though undoubtedly at some risk from general political violence, will rarely, if ever, constitute a distinct "social group" for the purposes of establishing refugee status. To hold otherwise would be tantamount to extending refugee status to every alien displaced by general conditions of unrest or violence in his or her home country. Refugee status simply does not extend as far as the petitioners would contend. *See Lopez v. INS*, 775 F.2d 1015, 1017 (9th Cir.1985); *Chavez*, 723 F.2d at 1434.

## C. Evidence of Persecution on Account of Petitioner's Class

■ Moreover, the petitioners have fallen somewhat short in making their case that the government of El Salvador has singled out individuals for persecution solely because they are young, working class, urban males who have failed to serve in the military or actively support the government. This failure was hardly through lack of effort. Virtually all of the evidence, both oral and documentary, presented at the deportation hearing—resulting in 1,860 pages of transcript from 15 days of hearings with 13 witnesses, as well as 51 exhibits covering 1,200 pages—was directed at this claim.

Several witnesses did make conclusory statements that young males are more likely to be suspected of disloyalty to the government of El Salvador, and thus are targeted for persecution. Former members of the Salvadorian military testified that security forces tended to be more suspicious of the young.

Still, the concrete evidence in the record, while demonstrating that young males were at risk of political violence, did not compel the conclusion that young men as such were targeted for persecution. As the IJ noted, the descriptions and statistics gathered at the hearing concerning the political violence in El Salvador are subject to varying interpretations depending upon the perspective of the reporter.

The evidence presented primarily indicated that political or social activist leaders and members of organizations directly identified as opposing or criticizing the government were seriously at risk of violent suppression by government or government-affiliated forces. The principal victims of persecution were people who belonged to opposition parties, union leaders, and young students of activist teachers. The actual incidents of persecution observed by one military officer witness involved young men discovered at night in areas of guerilla activities or individuals personally suspected of rebel sympathies. Although a substantial number of the victims have been young males—which would hardly be surprising in any violent conflict—the IJ and the BIA reasonably found that the evidence was inconclusive to establish that mere age and gender, even when combined with labor class background, urban residence, or political neutrality, had any bearing on the likelihood of persecution.

Instead, the evidence indicates that the risk of persecution relates principally to the existence of actual or imputed political opinion. This factor applies equally to all segments of the population of El Salvador,

and its existence turns upon individual circumstances.

Consequently, we must turn instead to the petitioners' claims for asylum and prohibition of deportation based upon individual circumstances.

## III

### GOVERNING LEGAL STANDARDS

■ To qualify for prohibition of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), an alien must demonstrate a "clear probability" that his life or freedom will be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic,* 467 U.S. 407, 413, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984); *Espinoza-Martinez v. INS,* 754 F.2d 1536, 1539 (9th Cir.1985). Under the clear probability standard an alien must show that "it is more likely than not" that he or she will be persecuted. *Stevic,* 467 U.S. at 429–30, 104 S.Ct. at 407.

We review the BIA's denial of an application for prohibition of deportation under the substantial evidence standard. *Vides-Vides v. INS,* 783 F.2d 1463, 1466 (9th Cir.1986); *Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1282 n. 8 (9th Cir.1984).

An alien who is unable to demonstrate a "clear probability of persecution" may still be eligible for a discretionary grant of asylum under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a), if he can show that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A). That section defines "refugee" as any person outside his country of nationality or habitual residence who is unable or unwilling to return "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

The Supreme Court has assumed, and we have expressly held, that the well-founded fear standard for asylum is "more generous" and "more liberal" than the clear probability test applied to petitions for prohibition of deportation. *Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1451 (9th Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986); *Bolanos-Hernandez,* 767 F.2d at 1281–83; *see also Stevic,* 467 U.S. at 425, 104 S.Ct. at 2498.

We review BIA decisions denying asylum under a two-tier standard. First, we determine whether substantial evidence supports the BIA's determination that an alien has failed to prove a well-founded fear of persecution. Second, if refugee status has been established, we review the BIA's ultimate denial of asylum for an abuse of discretion. *Vides-Vides,* 783 F.2d at 1466.

The petitioners contend that the BIA applied the unduly heavy clear probability burden of proof to their asylum claims, rather than the more generous well-founded fear standard. In the past, "[t]he BIA has often failed to recognize the crucial difference between these two standards." *Id.* at 1468. Prior to its resolution of the petitioners' claims in this case, the BIA had made clear that it does not regard the well-founded fear and the clear probability standards to be meaningfully different. *See Matter of Acosta,* Interim Dec. No. 2986 (BIA Mar. 1, 1985).

Despite the contrary views expressed in *Matter of Acosta,* the BIA expressly stated in this instant case that the law of the Ninth Circuit controlled its disposition. The BIA decision recognized that "[t]he Ninth Circuit has concluded that the 'well-founded fear' standard and the 'clear probability' standard are meaningfully different and that the former is 'more generous' than the latter. *Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1451 (9th Cir.1985); *Bolanos-Hernandez, supra* at 1282." The BIA quoted at length from this court's decision in *Cardoza-Fonseca,* and made clear that it was applying the standard described in that decision.

Still, the petitioners contend that the BIA applied the wrong standard in its discussion of the asylum claims. Focusing upon the BIA's occasional use of the words

"would be" or "will be" in its evaluation of the asylum claims, the petitioners argue that the BIA required them to demonstrate a probability that they would be persecuted. For example, in concluding its asylum analysis, the BIA stated that the petitioners "have not shown any special, individualized circumstances indicating that they have been or will be singled out for persecution."

■ The use of one particular word is not dispositive of whether the proper standard was applied. *Florez-De Solis v. INS,* 796 F.2d 330, 334 & n. 2 (9th Cir.1986). Reading the entire decision in context, it is apparent that the BIA was merely stating that an objective basis must be shown for a well-founded fear that the petitioners would be persecuted. "There is clearly a substantial difference between a demand that the alien demonstrate that []he *would be* persecuted if deported, and a demand that the alien demonstrate that []he has a *well-founded fear that []he would be persecuted." Florez-De Solis,* 796 F.2d at 336 (Wallace, J., concurring). A few inartfully chosen words will not overcome the clear indication, confirmed by frequent references to decisions from this circuit, that the BIA applied the distinctive standard of well-founded fear to the petitioners' asylum claims.

The BIA accordingly applied the appropriate legal standards in analyzing the petitioners' claims. We must now determine whether substantial evidence supports its conclusion under those standards. *See Rebollo-Jovel v. INS,* 794 F.2d 441, 447 (9th Cir.1986).

## IV

### INDIVIDUAL CLAIMS OF PERSECUTION

The "well-founded fear" standard applied to asylum claims under section 208(a) of the Refugee Act, 8 U.S.C. § 1158(a), includes both a subjective component, requiring the fear to be genuine, and an objective component, which "requires a showing by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution." *Diaz-Escobar v. INS,* 782 F.2d 1488, 1492 (9th Cir.1986); *see also Rebollo-Jovel v. INS,* 794 F.2d 441, 443 (9th Cir. 1986). Additionally, "the evidence should be specific enough to indicate that the alien's predicament is appreciably different from the dangers faced by the alien's fellow citizens." *Vides-Vides v. INS,* 783 F.2d 1463, 1469 (9th Cir.1986).

The INS concedes that the petitioners are sincere in their belief that they would be at risk of persecution upon their return to El Salvador. However, the petitioners must prove that their fear is *both* subjectively genuine and objectively reasonable. *See id.* (quoting *Diaz-Escobar,* 782 F.2d at 1492).

■ We must apply a deferential standard of substantial evidence to the BIA's conclusions based upon the evidence in the record. Consequently, "we may not reverse the BIA simply because we disagree with its evaluation of the facts, but only if we conclude that the BIA's evaluation is not supported by substantial evidence." *Diaz-Escobar,* 782 F.2d at 1493. Although the petitioners have presented a persuasive case, we cannot conclude that the BIA's denial of the asylum claim is unsupported by substantial evidence on the record as a whole.

### A. *Luis Alonzo Sanchez-Trujillo*

Sanchez, now age 33, left El Salvador in November, 1979. Before his departure, he was a resident of Soyopango, an industrial city.

On four occasions, while waiting at a bus stop or riding a bus, Sanchez, along with several other people, was briefly detained by security forces who searched for weapons and inspected documents. However, Sanchez was never arrested or abused during these incidents, which apparently are a common aspect of life in El Salvador.

While in El Salvador, Sanchez was a member of a Catholic youth organization. The group was not political, but rather

worked to assist the local priest in religious celebrations and to provide assistance to the poor in the community. During Sanchez' membership in the youth group, no harm ever came to any of its members.

The local priest disappeared for a period of about one month and later returned with bruises on his face. Sanchez was told the priest had been captured by security forces and tortured. The testimony in the record indicates the priest was arrested shortly after two violent disturbances had taken place directly in front of the church. However, the Catholic youth group was not involved in the demonstrations, nor were its members molested when the priest was arrested. The arrest of the priest appears to have been prompted by the demonstrations in the vicinity of the church, not by any activities of the youth group.

Sanchez engaged in no political activity while in El Salvador. After entering the United States, he was briefly involved with the Frente Unido Salvadoreno, a small group which protested conditions in El Salvador. Sanchez, along with hundreds of other people, joined in a few demonstrations in opposition to the government of El Salvador. On one occasion, Sanchez sang an original song protesting conditions in El Salvador to an assemblage of several hundred people. Sanchez last attended a meeting of this organization in August, 1981.

There is no evidence that the government of El Salvador has ever been made aware of Sanchez' political activities while in this country. Although Sanchez believes he was photographed by government informants, he could offer no direct evidence to that effect. In *Garcia-Ramos v. INS*, 775 F.2d 1370, 1374 (9th Cir.1985), we assumed that an alien's dissident activities had come to the attention of the government where the alien had openly and continuously participated in opposition activities and committed illegal acts while present in El Salvador. By contrast, any unsupported presumption that an alien's activities inside the United States have been brought to the attention of a foreign government is unfounded.[8]

Finally, four of Sanchez' brothers have remained in El Salvador. Although three of his brothers are of military age, they have not been harassed, harmed, or threatened by government authorities. *See Vides-Vides*, 783 F.2d at 1467.

### B. *Luis Armando Escobar-Nieto*

Escobar, now age 26, left El Salvador in early 1980. He had been an auto mechanic in the capital city of San Salvador.

His primary basis for claiming a well-founded fear of persecution stems from an attack made upon him very late one evening as he walked along the street in San Salvador. Several men dressed in civilian clothing jumped from a van bearing government license plates, threw him into the van, beat him, threatened him with death, and robbed him. They dumped him out of the van after an hour and a half. Several days later, he recognized one of the men who had attacked him, wearing his jacket which had been stolen from him, riding in a police car.

8. In *Ghadessi v. INS*, 797 F.2d 804, 807–08 (9th Cir.1986), and *Sakhavat v. INS*, 796 F.2d 1201, 1203–04 (9th Cir.1986), we gave substantial weight to the asylum applicants' extensive involvement in protests against the Iranian government which had taken place in the United States. However, in both *Ghadessi* and *Sakhavat*, there were also allegations that the petitioners' disloyalty had come to the attention of the Khomeini regime. In *Ghadessi*, the petitioner's parents had been detained and interrogated regarding her participation in dissident activities. 797 F.2d at 808–09. In *Sakhavat*, the petitioners' father had been beaten and ordered to stop his sons' protest activities, and petition-ers' brother had apparently been executed. 796 F.2d at 1204. In addition, Sakhavat had been attacked inside the United States by pro-Khomeini students. *Id.* at 1204. More importantly, both cases involved motions to reopen deportation proceedings. While the aliens' allegations of dissident activities in the United States, combined with several other important factors, were held sufficient to establish a prima facie case for asylum or prohibition of deportation, we expressed no view as to whether this evidence would be "sufficient to establish ... eligibility for asylum after a full hearing on the merits." *Ghadessi*, 797 F.2d at 809.

Although his assailants accused him of rebel group membership, there is no indication that they suspected him personally of anti-government sentiments or even knew who he was. The accusation appears to be simply part of their general shakedown of an unknown man they discovered upon the streets at night. Substantial evidence supports the BIA's inference that this was merely an isolated incident where Escobar had happened to be in the wrong place at the wrong time. The attack was a "random occur[rence] indicative of the general upheaval in El Salvador." *See Florez-De Solis,* 796 F.2d at 335.

Escobar on one occasion marched with hundreds of others on behalf of mothers of young men who had disappeared. After Escobar left the march, the demonstration was violently dispersed. He was also one of thousands present at the funeral of Archbishop Romero and observed an attack by security forces on attendees, although he was not involved in the violence. In neither case was Escobar attacked, nor could he identify any persecution that resulted from his minor involvement with hundreds of others in these two public assemblies.

### C. Conclusion

In sum, the IJ reasonably concluded that none of the incidents related by either petitioner appears to be "a result of any specific effort aimed at them in particular based upon their political and religious beliefs." The record does not compel the conclusion that the petitioners' situation ·upon their return to El Salvador will be any different from the dangers faced by other citizens of that war-torn country. *See Vides-Vides,* 783 F.2d at 1469.

9. The amicus curiae brief filed by the American Civil Liberties Union Foundations of Northern and Southern California and the National Lawyers Guild, Seattle Chapter, devotes considerable attention· to the theory that principles of customary international law prohibit the return of civilians seeking refuge from internal armed conflict to nations unable to guarantee their human rights.

Since the petitioners failed to demonstrate a "well-founded fear" of persecution to establish eligibility for asylum, they *a fortiori* have failed to meet the more stringent standard of "clear probability" of persecution to obtain prohibition of deportation.[9] *See Rebollo-Jovel,* 794 F.2d at 448; *Diaz-Escobar,* 782 F.2d at 1492.

The decision of the BIA is AFFIRMED, and the petition for review is DENIED.

As no claims based upon customary international law were raised before the IJ or the BIA, this issue is not properly before us on appeal. *See Chavez v. INS,* 723 F.2d 1431, 1434 (9th Cir.1984). Moreover, the petitioners' opening brief did not raise any issue of customary international law in the questions they present to this court. An amicus brief may not frame the questions to be resolved in an appeal.