**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DELMY LETICIA ARGUETA-RODRIGUEZ,
Petitioner,

v.

No. 95-2367

U.S. IMMIGRATION & NATURALIZATION
SERVICE,
Respondent.

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A72-379-183)

Argued: November 1, 1996

Decided: October 29, 1997

Before ERVIN, Circuit Judge, BOYLE,
United States District Judge for the
Eastern District of North Carolina, sitting by designation, and
JACKSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Petition for review denied by unpublished opinions concurring in the
judgment.

_____

**COUNSEL**

**ARGUED:** John William O'Leary, Washington, D.C., for Petitioner.
Farzin Franklin Amanat, Office of Immigration Litigation, Civil Divi-
sion, UNITED STATES DEPARTMENT OF JUSTICE, Washington,

D.C., for Respondent. **ON BRIEF:** Frank W. Hunger, Assistant
Attorney General, David J. Kline, Assistant Director, Regina Byrd,
Office of Immigration Litigation, Civil Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**JUDGMENT**

The Court denies the petition for review of a final order of the
Board of Immigration Appeals filed by Delmy Leticia Argueta-
Rodriguez.

PETITION DENIED

JACKSON, District Judge, concurring in the judgment:

Delmy Leticia Argueta-Rodriguez petitions for review of a final
order of the Board of Immigration Appeals (Board) denying her appli-
cation for political asylum and withholding of deportation. Because
substantial evidence supports the Board's decision, the petition should
be denied.

I.

Petitioner Delmy Leticia Argueta-Rodriguez was born on February
18, 1971, in Canton Rodeo Jocoaitique, Morazan Department, El Sal-
vador. She was ten years old when her family village of El Mozote
was massacred by Salvadoran army soldiers in December 1981.
Argueta-Rodriguez was with her grandmother in a nearby village the
day of the massacre. She escaped harm but saw her village burning
in the distance.

Argueta-Rodriguez moved from one relative to another, bore a
child with a live-in companion, and, in June 1992, entered the United

2

States without inspection. She applied for political asylum in July 1992 but was denied. Deportability was conceded in written court pleadings of September 23, 1994, and relief was denied by the Immigration Court in the hearing on December 2, 1994.

In its final order dated May 5, 1995, the Board of Immigration Appeals affirmed the Immigration Court's decision to deny relief. The Board determined that Petitioner was a credible witness but agreed with the Immigration Judge that she had failed to establish eligibility for asylum or withholding of deportation. The Board held that the actions of the Salvadoran army did not establish that the victims of the massacre were persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion. The Board took note of the fact that Petitioner was outside the village when the inhabitants were massacred and there was no indication that Petitioner or other former residents were sought out by the army. The Board also noted that Petitioner lived in El Salvador for ten years after the massacre without incident.

Additionally, the Board held that because Petitioner had not established that she had a well-founded fear of future persecution, she did not demonstrate a clear probability of it. Therefore, withholding of deportation was also denied. On July 14, 1995, Petitioner timely appealed to this Court to review the Board's final order.

II.

The Immigration and Nationality Act (INA) authorizes the Attorney General, in her discretion, to confer asylum on any "refugee." 8 U.S.C.A. § 1158(a) (West Supp. 1996). The INA defines "refugee" as a person unwilling or unable to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(A) (West Supp. 1996). There are three elements the alien must establish to qualify for withholding of deportation or asylum based on membership in a particular social group. The alien must (1) identify a group that constitutes a "particular social group," (2) establish that she is a member of that group, and (3) show that she would be persecuted or has a well-

3

founded fear of persecution based on that membership. <u>Fatin v. I.N.S.</u>, 12 F.3d 1233, 1240 (3d Cir. 1993).

A reviewing court must uphold the Board's determination if the determination is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C.A. § 1105a(a)(4)(West 1970).

III.

Petitioner argues that the Board incorrectly failed to acknowledge her as a member of a discrete and insular social group protected by the INA. Petitioner seeks to have the Court recognize the "children of El Mozote" as such a social group. Petitioner argues that if she is a member of such a group, the Board erred in its determination that asylum should not be granted.

To demonstrate membership in a particular social group, the Petitioner must show:

> persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the member of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

<u>Fatin v. I.N.S.</u>, 12 F.3d 1233, 1239-40 (3d Cir. 1993), quoting <u>Matter of Acosta</u>, 19 I. & N. Dec. 211, 233 (BIA 1985).

Petitioner argued extensively about the atrocity committed in the village of El Mozote. She has provided much evidence establishing

4

the tragic and gruesome nature of the killings. The occurrence of the massacre and Petitioner's affiliation with the village is not in dispute. The issue Petitioner presents to this Court is whether her characterization of herself as a "child of El Mozote" places her in a group protected within the meaning of the statute. That protection only applies when one is a member of such a group, <u>and is in fear of persecution based upon her membership</u>. <u>See Fatin</u>, 12 F.3d at 1240. Here, the Court does not need to determine her group membership. Regardless of the group within which Petitioner identifies herself, her claim must fail under the requirements of the Immigration Act because there exists no fear of persecution.

Petitioner has not shown that she would be persecuted or that she has a well-founded fear of persecution as a former resident of the village of El Mozote. In fact, Petitioner concedes that no such fear of persecution exists. (Pet. Brief at 14.) While documents submitted by Petitioner show that there is still violence in El Salvador, they do not show any violence directed at former residents or survivors of El Mozote. No evidence suggests that those responsible for the El Mozote massacre would be interested in Petitioner due to her status as a former resident. Before coming to the United States, Petitioner was able to live in El Salvador for ten years following the massacre without any signs that those responsible for the massacre sought to harm her. Moreover, another outspoken survivor of the massacre now lives in El Salvador and has not been the subject of any retribution. Thus, even if Petitioner were to establish that "children of El Mozote" shared a characteristic such as color, kinship tie, or a shared past experience akin to former military leadership or land ownership, and that that characteristic was one that could not or should not be required to change, <u>see Fatin</u>, 12 F.3d at 1239-40, Petitioner has not satisfied the third element; that is, she has conceded that she has no fear of suffering persecution based on her membership in that group. Therefore, Petitioner's claim for asylum must fail.

The standard for withholding of deportation is more stringent than that for granting asylum. <u>I.N.S. v. Cardoza-Fonseca</u>, 480 U.S. 421, 431-32 (1987). As Petitioner has not established entitlement to asylum, she cannot meet the more stringent standard for withholding of deportation.

5

IV.

Accordingly, I concur in the judgment to deny the petition for review.

BOYLE, District Judge, concurring in the judgment:

I concur in the judgment of the panel that the petition for review should be denied without joining in either of the panel's opinions.

ERVIN, Circuit Judge, concurring in the judgment:

Although I agree with the conclusion reached by both of my colleagues that Petitioner Argueta-Rodriguez's (Argueta) Petition for Review should be denied, I write separately to express my views as to what Argueta needed to show to prevail and to explain why she must fail in these circumstances.

This case arises in a unique factual posture: a claim for asylum based on past persecution due to membership in a particular social group. Under 8 U.S.C. § 1158(a) the Attorney General possesses discretion to grant asylum to an alien physically present in the United States if the alien qualifies as a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). That section provides:

> The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42). The INS's own regulations provide that an alien may qualify as a refugee because "he has suffered actual past persecution." 8 C.F.R. § 208.13(b); see also In re Chen, Interim Decision 3104, 1989 WL 331860 at 3 (B.I.A. 1989). The persecution suf-

6

fered must be on account of one of the five statutory grounds above, but, once established, creates a rebuttable presumption of a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1); Chen, 1989 WL 331860 at 3. In the instant case, Argueta concedes she has no well-founded fear of future persecution but argues she suffered past persecution on account of her membership in a particular social group.

Most cases that arise involve the second, "well-founded fear of persecution" prong of eligibility, as, for example, do those that we have previously addressed. See, e.g., Huaman-Cornelio v. Board of Immigration Appeals, 979 F.2d 995 (4th Cir. 1992); M.A. v. INS, 899 F.2d 304 (4th Cir. 1990) (en banc); Cruz-Lopez v. INS , 802 F.2d 1518 (4th Cir. 1986). I am persuaded that this case does not involve this prong, but instead should be decided under the first factor.**1**

Unlike in cases of future persecution where the alien must demonstrate "a specific threat directed towards him on account of an impermissible statutory factor," M.A., 899 F.2d at 315, the BIA itself has recognized that in cases of past persecution atrocities visited upon the family may be sufficient to warrant a favorable exercise of discretion in granting asylum for general humanitarian reasons. Chen, 1989 WL 331860 at 3 (relying upon The Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva 1979) for the "general humanitarian principle" that"[i]t is frequently recognized that a person who--or whose family--has suffered under atrocious forms of persecution should not be expected to repatriate" (emphasis added)); see also Acewicz v. INS, 984 F.2d 1056, 1062 (9th Cir. 1993) (recognizing eligibility for asylum based on past persecution "where an applicant or his family has suffered`under atrocious forms of persecution'" (citation omitted) (emphasis added)). In the instant case,

_____

**1** Although less common, the past persecution prong is not entirely moribund. Recently, the Ninth Circuit has issued a number of opinions in which that court has not only considered claims of past persecution, but also has reversed Board of Immigration Appeals (BIA or Board) decisions or remanded for further proceedings. See, e.g., Surita v. INS, 95 F.3d 814, 819-20 (9th Cir. 1996); Singh v. INS, 94 F.3d 1353, 1360 (9th Cir. 1996); Gonzalez v. INS, 82 F.3d 903, 910 (9th Cir. 1996); Singh v. Ilchert, 69 F.3d 375, 379 (9th Cir. 1995).

the BIA's decision is unclear as to whether Argueta has failed to demonstrate she has suffered from past persecution at all or whether she failed to demonstrate persecution on the basis of one of the statutory factors or both.[2] Despite the Board's claims to the contrary on this appeal, the better reading of the BIA decision below would find that the Board implicitly recognized that Argueta had suffered past persecution but denied her appeal on the basis of her failure to satisfy one of the five statutory factors. Indeed, if family persecution is to count at all, it is hard to imagine a more direct, atrocious, and final persecution than to have both of one's parents, all five siblings, sundry other relatives, and just about everyone one grew up knowing all brutally murdered and then incinerated. No case has held that one must have

_____

[2] The BIA's decision, while unclear, implicitly appears to have accepted Argueta's claim that she has suffered past persecution sufficient to satisfy that aspect of the statutory requirement for refugee status under 8 U.S.C. § 1101(a)(42). But the BIA concluded that Argueta could not satisfy the remainder of the statutory requirement:

> However deplorable the actions of the Salvadoran army troops in destroying an entire village may have been, they do not establish that the respondent was persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion. As noted by the United States Supreme Court in INS v. Elias[-]Zacarias, 502 U.S. 478 (1992), an alien must do more than simply show civil rights or human rights violations in order to demonstrate persecution within the meaning of the Act. . . . While the evidence indicates that [Argueta's] family members were killed along with many other villagers by the Salvadoran army, possibly due to a perception that residents of the village were guerrilla sympathizers or as some kind of lesson to local guerrillas, [Argueta] has not shown that she was persecuted by the Salvadoran army on account of one of the prescribed grounds in the statute. [Argueta] was outside the village at the time of the massacre, and there is no indication that [Argueta] or any other former residents were sought out by the army following the massacre. We note that [Argueta] continued living in El Salvador without incident for more than a decade following the December 1981 massacre, during which time she was able to attend school and complete her education.

In re Argueta-Rodriquez, No. A72-379-183, slip op. at 5 (B.I.A. May 5, 1995).

8

been an eye-witness to the massacre of one's family to suffer from persecution; moreover, there is ample evidence that Argueta, in fact, saw red fumes coming from her village and believed that color to indicate that bodies were being burned. Although I believe that for the proper resolution of this appeal we do not need to reach the matter, surely "no reasonable factfinder could fail to find" past persecution on this evidence. INS v. Elias-Zacarias, 502 U.S. 478, 484 (1992).

The much more difficult problem is whether the persecution Argueta has suffered was due to her membership in a particular social group. Like the issue of past persecution, this statutory factor has been only rarely dealt with by courts, and it appears to be the least litigated factor of the five. Fortunately, most of those courts that have considered the matter have attempted to analyze the meaning and parameters of "particular social group." See, e.g., Fatin v. INS, 12 F.3d 1233, 1238-40 (3d Cir. 1993); Gebremichael v. INS, 10 F.3d 28, 35-36 (1st Cir. 1993); Gomez v. INS, 947 F.2d 660, 664 (2d Cir. 1991); Sanchez-Trujillo v. INS, 801 F.2d 1571, 1573-78 (9th Cir. 1986); Ananeh-Firempong v. INS, 766 F.2d 621, 626 (1st Cir. 1985).

However, as an initial matter, unfortunately, these courts are not agreed on the appropriate standard of review. Unlike the issue of persecution itself, whether past or future, where it is clear how to apply the substantial evidence standard, the proper review of "particular social group" is less certain. The First Circuit in Gebremichael found the BIA's determination of statutory eligibility for relief from deportation under this factor to be a mixed question of law and fact and applied the substantial evidence test. Gebremichael, 10 F.3d at 34. By contrast, the Third Circuit in Fatin performed a Chevron analysis of the BIA's construction of the phrase, see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984), and, after finding it to be permissible and thus binding on the court, appeared to undertake a de novo review of that construction to the facts of the case. Fatin, 12 F.3d at 1239-42. Analytically, the BIA's determination that an alien is or is not a member of a particular social group presents a question of fact to which the substantial evidence test should apply. But the determination of whether a purported social group is, indeed, a "particular social group" within the meaning of the statute shades into becoming a legal question for which the Third Circuit's apparent approach is preferred.

9

Courts are agreed that there is no evidence of legislative intent behind the phrase "particular social group" and that it derives from the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which Congress in the Refugee Act of 1980 sought to conform. Fatin, 12 F.3d at 1239; Sanchez-Trujillo, 801 F.2d at 1575. Previously, the BIA, employing the doctrine of ejusdem generis, construed the phrase as relating to

> a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

In re Acosta, 19 I. & N. Dec. 211, 233 (B.I.A. 1985). The Fatin court found this to be a permissible construction of the statute and thus concluded it was bound to accept it under Chevron . Fatin, 12 F.3d at 1239-40; see also INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48 (1987). Courts that have not undertaken a Chevron analysis have nevertheless interpreted the phrase in similar terms. See Sanchez-Trujillo, 801 F.2d at 1576 ("[T]he phrase `particular social group' implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest. Of central concern is the existence of a voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group." (emphasis in original)); Ananeh-Firempong, 766 F.2d at 626 (turning to the U.N.'s Handbook on Procedures and Criteria for Determining Refugee Status for the interpretation that a "`particular social group' normally comprises persons of similar background, habits or social status. . . . Membership of [sic] such a particular social group may be at the root of persecution because there is no confidence in the group's loyalty to the Government or because . . . the

10

very existence of the social group as such[ ] is held to be an obstacle to the Government's policies." (citations omitted)).

Once "particular social group" is understood, courts apply a multi-factor test to determine whether an alien is eligible for relief based on such group membership. The Third Circuit's three-part test requires the alien to

> (1) identify a group that constitutes a "particular social group" within the interpretation [of the BIA], (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership.

Fatin, 12 F.3d at 1240. Presumably, where the claim is based on past persecution, as in the instant case, the third element would require a showing that the alien suffered past persecution based on that membership. The Ninth Circuit has stated the third element as one determining whether "the purported `social group' has in fact been targeted for persecution on account of the characteristics of the group members." Sanchez-Trujillo, 801 F.2d at 1575. This reading seems preferable since it can apply in cases of both past and future persecution. The Ninth Circuit also recognized a fourth element in considering "whether such `special circumstances' are present to warrant us in regarding mere membership in that `social group' as constituting per se eligibility for asylum or prohibition of deportation." Id.

One of my colleagues rests his decision on Argueta's failure to satisfy the third factor of the Fatin test and accordingly refused to reach the issue of Argueta's social group. In the particular context of Argueta's claim of past persecution, I believe this analysis misapplies that third factor. However, because I think that Argueta cannot satisfy the first factor, I would not reach the other factors but nevertheless concur in the judgment unanimously agreed upon to deny the petition for review.

Although somewhat unclear, it appears that the BIA understood Argueta to claim the "particular social group" to which she belonged to be the "children from El Mozote."[3] On appeal, the Board character-

_____

[3] El Mozote was Argueta's native village in El Salvador, from which she was absent when the massacre occurred. Unbeknownst to her, there

11

izes the matter as Argueta failing altogether to identify a group and the Board defining the group as "children of El Mozote." Certainly at oral argument, Argueta's own arguments focused on "children of El Mozote" as the particular social group to which she purportedly belonged. I therefore accept, and analyze, Argueta's claim on the basis of her apparent characterization of herself as a child of El Mozote. The "children of El Mozote," however, simply does not constitute a particular social group under the BIA's, or other, case law, and Argueta's characterization therefore fails the first factor of the Fatin test.

As an initial matter, being a "child of El Mozote" is not an immutable characteristic. Argueta herself is no longer a child, but an adult, and from the time of the massacre has dissociated herself from El Mozote. Argueta does not argue that the "children of El Mozote" are bound by kinship ties. Moreover, these purported members of the group are not united by shared past experiences akin to land ownership or former military leadership. Indeed, the only shared past experience is that they would all have been children at some point in the village of El Mozote. This single common characteristic is not so fundamental to identity or conscience as to bind these individuals into a protectable social group. See Acosta, 19 I. & N. Dec. at 233.

Furthermore, the "children of El Mozote" are not actuated by some common impulse or interest. Membership in this purported group is not based on a voluntary associational relationship. See Sanchez-Trujillo, 801 F.2d at 1576. Finally, Argueta presented no probative evidence that those responsible for the El Mozote massacre were particularly interested in her due to her status as one of the "children of El Mozote." As the Board noted, Argueta continued to live in El Salvador for ten years following the massacre without any indication that those responsible for the massacre attempted to harm her, or even seek her out. There is simply no suggestion that being one of the "children of El Mozote" was at the root of the persecution, that the group's allegiances were in doubt, or that the very existence of the

_____

was apparently only one other survivor. All of the children present in the village were executed.

group presented some sort of obstacle to those responsible for the massacre. See Ananeh-Firempong v. I.N.S., 766 F.2d at 626.

I therefore conclude that the "children of El Mozote" is not a particular social group within the meaning of 8 U.S.C.§ 1101(a)(42)(A). Because Argueta fails to satisfy the first factor of the Fatin test, I would not reach the others. Substantial evidence therefore supports the Board's conclusion that Argueta's application for asylum must fail. Because by this analysis I arrive at the same result as my colleagues, I concur in the judgment that Argueta's Petition for Review should be denied.

13