NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1060

_____

SILVIO AUGUSTO LIMA CARNEIRO;
LUCIENE ALVES DE SOUZA; L. S. C.; M. A. C.,
Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
(A220-220-565, A220-220-566, A220-220-567, A220-220-568)
Immigration Judge: Dennis Ryan

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 1, 2025

Before: SHWARTZ, MATEY, and FISHER, *Circuit Judges*.

(Filed: November 25, 2025)

_____

OPINION[*]

_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

FISHER, *Circuit Judge*.

The petitioners—Silvio Augusto Lima Carneiro, his wife Luciene Alves de Souza, and their children L.S.C. and M.A.C.—are Brazilian natives and citizens who unlawfully entered the United States in September 2021. Within a month, the Department of Homeland Security brought removal proceedings against them. The petitioners conceded removability, but applied for asylum, for statutory withholding of removal, and for protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). An immigration judge denied their applications, and the Board of Immigration Appeals (BIA) dismissed their appeal. We will deny their petitions for review.[1]

To qualify for asylum, an alien must establish that he or she is a "refugee,"[2] which is defined as an alien who has experienced past persecution, or fears future persecution, "on account of" a protected ground.[3] Similarly, removal must be withheld where an

---

[1] The agency had jurisdiction under 8 U.S.C. § 1103 and 8 C.F.R. § 1003.1(b). We have jurisdiction under 8 U.S.C. § 1252(a). Where, as here, the BIA affirms and partially reiterates the immigration judge's determinations, we look to both decisions. *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d Cir. 2009). Where the BIA relied only on a few of the immigration judge's grounds for denying relief, we review only those grounds. *Chukwu v. Att'y Gen.*, 484 F.3d 185, 193 (3d Cir. 2007). We review for substantial evidence the agency's factual findings, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), and we review the agency's legal determinations *de novo*, *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020).
[2] 8 U.S.C. § 1158(b)(1)(A).
[3] *Id.* § 1101(a)(42)(A).

2

"alien's life or freedom would be threatened . . . because of" a protected ground.[4] In other words, to qualify for either asylum or withholding of removal, the petitioners must show a nexus between the feared persecution and a protected ground—race, religion, nationality, membership in a particular social group (PSG), or political opinion.[5]

The petitioners allege that in Brazil they will face persecution on account of their membership in three PSGs: (1) debtors in Brazil who are not protected by the government; (2) people who borrow money from loan sharks; and (3) family members of Carneiro, the lead petitioner. The BIA affirmed the immigration judge's dispositive finding that the petitioners failed to establish on account of a protected ground past persecution or a fear of future persecution.

Substantial evidence supports the agency's determination. After Carneiro borrowed money from a loan shark, Fernando, and failed to pay his debt, Fernando visited Carneiro's home on three occasions. Fernando threatened that Carneiro "was going to pay [the debt] one way or another"[6] and warned that, if he failed to pay, Carneiro's family would pay with their lives. None of these threats show that Fernando had animus towards Carneiro's family group as a class; rather, each threat was an isolated attempt to coerce Carneiro to pay his debt. Likewise, the record fails to show that Fernando harbored animus against debtors or persons who borrow money from loan

---

[4] *Id.* § 1231(b)(3)(A).
[5] *Id.* §§ 1101(a)(42)(A), 1231(b)(3)(A).
[6] AR 162.

sharks. Carneiro testified that "[o]nly those who do not pay are harmed" by the loan sharks.[7] Fernando's "bare desire for money," without more, does not reflect "hostility" against Carneiro or his family on account of their membership in a protected group.[8] Accordingly, substantial evidence supports the agency's dispositive conclusion that the petitioners did not establish persecution on account of a protected ground. Therefore, the petitioners are not eligible for asylum or statutory withholding of removal.

In support of their CAT claims, the petitioners argue that the BIA erred by failing to conduct an analysis under *Myrie v. Attorney General,* 855 F.3d 509 (3d Cir. 2017). However, contrary to the petitioners' contention, the immigration judge conducted an analysis under *Myrie*. And relying on the reasons cited by the immigration judge, the BIA affirmed the immigration judge's denial of CAT protection. Therefore, the issue is whether the immigration judge correctly applied *Myrie*.

To obtain relief under the CAT, an applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."[9] To do so, the applicant must show that: (1) if returned to his or her country of

---

[7] AR 199.
[8] *Shehu v. Att'y Gen.*, 482 F.3d 652, 657 (3d Cir. 2007); *see also Thayalan v. Att'y Gen.*, 997 F.3d 132, 144 (3d Cir. 2021) ("[A]n alien targeted out of a simple desire for money has not experienced persecution on account of a ground protected by the INA."); *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 (3d Cir. 2015) ("Conflicts of a personal nature and isolated criminal acts do not constitute persecution on account of a protected characteristic.")
[9] *Myrie,* 855 F.3d at 515 (citing 8 C.F.R. § 1208.16(c)(2)).

4

origin, he or she will suffer torture, and (2) the government will acquiesce to that torture.[10] Each prong includes two inquiries.[11] The first prong asks (1A) what harm the applicant will suffer if he returns home, and (1B) whether that harm would amount to torture.[12] The second prong asks (2A) how public officials will likely respond to that harm, and (2B) whether the response would amount to acquiescence.[13] We review steps 1A and 2A for substantial evidence, and we review *de novo* steps 1B and 2B.[14]

The immigration judge, whose reasoning was affirmed by the BIA, determined that the petitioners did not satisfy either prong. First, the immigration judge determined that, if they returned to Brazil, Fernando would not more than likely harm the petitioners because they could either repay Fernando or relocate elsewhere in Brazil. The petitioners argue that, if they return to Brazil, Fernando will harm them for making Fernando appear weak and argue that they cannot relocate elsewhere in Brazil because Carneiro's daughter would reveal the petitioners' location by posting on social media. Besides Carneiro's opinion, nothing in the record shows that Fernando would harm the petitioners after Carneiro paid his debts. Also, Carneiro testified that he never asked his daughter to stop using social media, and Carneiro failed to identify another way in which the loan sharks could find the petitioners. Therefore, substantial evidence supports the agency's factual

---

[10] *Id.* at 516.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *See Galeas Figueroa v. Att'y Gen.*, 998 F.3d 77, 92–93 (3d Cir. 2021).

finding. We agree that, if returned to Brazil, the petitioners would not more than likely suffer torture.

Second, even if the petitioners established that they would more than likely suffer torture in Brazil, they failed to show that the government would acquiesce to that torture. The immigration judge found no persuasive evidence that the Brazilian government is unable or unwilling to assist the petitioner and found no evidence that the Brazilian government acquiesces to private actors' extorting Brazilian citizens. We agree.

Despite the numerous local, state, and federal law enforcement entities in Brazil, Carneiro never contacted the police. Carneiro testified that Fernando was "in communication with the police" and that "there were police officers who work for [the loan sharks]."[15] However, besides his conclusory testimony, Carneiro failed to identify any evidence to support his contention that the police are working with Fernando.[16] Although every predictive judgment is subject to second-guessing, especially one that involves the behavior of foreign governmental actors, the agency's conclusion is not one that a reasonable adjudicator would be compelled to reject.[17] Accordingly, substantial evidence supports the agency's conclusion that the petitioners failed to show that the Brazilian government would more than likely acquiesce to torture. Therefore, the petitioners are not eligible for CAT relief.

---

[15] AR 164–65.

[16] *Id.*

[17] *See Galeas Figueroa*, 998 F.3d at 93 (citing 8 U.S.C. § 1252(b)(4)(B)).

For the reasons stated above, we will deny each petition for review.

MATEY, *Circuit Judge*, concurring.

Carneiro claims membership in "particular social groups" he defines as Brazilian debtors, loan shark borrowers, and his family. In other words, "me." I agree that cannot be correct, and I write separately because his arguments follow a now-familiar expansion of an exceedingly specific standard. Thirty years ago, this Court inquired into the origins of the term "particular social group" and concluded that "neither the legislative history of the relevant United States statutes nor the negotiating history of the pertinent international agreements" provide much helpful context. *Fatin v. INS*, 12 F.3d 1233, 1239 (3d Cir. 1993). But a deeper analysis, enabled by the increasing digital availability of primary sources, reveals that the "particular social group" category was originally understood to protect postwar victims of persecution by totalitarian governments. Our cases have diverged sharply from this meaning and should be reconsidered.

## I.

The term "particular social group" sprang from the United Nations Convention Relating to the Status of Refugees, which defines a "refugee" as any person who fears persecution "for reasons of race, religion, nationality, membership of a particular social group or political opinion." Art. 1(A)(2), *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 [hereinafter "Convention"]. "The origin of the [Convention's] definition of 'refugee' is found in the 1946 Constitution of the International Refugee Organization," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 437 (1987), a definition originally keyed to persecution based on a person's "race, religion, nationality, or political opinions," Const. of the Int'l Refugee Org., Annex I, Part I, § C(1)(a)(i), *opened for*

1

*signature* Dec. 15, 1946, 62 Stat. 3037, 3052, T.I.A.S. No. 1846. Indeed, an early draft of the Convention included only these four grounds for refugee status. U.N. Econ. & Soc. Council, *Report of the Ad Hoc Committee on Statelessness and Related Problems* at 8, U.N. Doc. E/1850, E/AC.32/8 (Aug. 25, 1950).

Then, during U.N. debate on the Convention, the Swedish delegate remarked that "experience had shown that certain refugees had been persecuted because they belonged to particular social groups. The draft Convention made no provision for such cases, and one designed to cover them should accordingly be included." U.N. GAOR, Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, 3d meeting at 14, U.N. Doc. A/CONF.2/SR.3 (Nov. 19, 1951). So the delegate introduced a provision adding a category for a "particular social group," which was approved without further discussion. U.N. GAOR, Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, 23d meeting at 8, U.N. Doc. A/CONF.2/SR.23 (Nov. 26, 1951). But the "lack of substantive debate on the issue suggests that contemporary examples of such persecution may have been in the minds of the drafters, such as resulted from the 'restructuring' of society then being undertaken in the socialist States and the special attention reserved for landowners, capitalist class members, independent business people, the middle class and their families." Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 201 (3d ed. 2007). Indeed, West German courts in the 1950s and 1960s recognized many of these groups of Eastern European refugees fleeing communist regimes.[1]

---

[1] *See* Daniel Compton, Comment, *Asylum for Persecuted Social Groups: A Closed Door Left Slightly Ajar—*Sanchez-Trujillo v. INS, *801 F.2d 1571 (9th Cir. 1986)*, 62

But the little legislative history available suggests that the Swedish delegate likely had an even narrower understanding of this phrase. The Convention extended only to "events occurring before 1 January 1951," and allowed signatories the option of accepting only European refugees. Art. 1(B)(1). The Swedish delegate expressed his support of such a limited policy for his own country. U.N. GAOR, Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, 19th meeting at 13, U.N. Doc. A/CONF.2/SR.19 (Nov. 26, 1951). That he introduced the phrase "particular social group" suggests that he believed the category was consistent with only extending protection to European wartime refugees. That reading is bolstered by a letter drafted by the same Swedish delegate,[2] explaining that the category would also harmonize the Convention's definition of a refugee with a forthcoming Swedish statute that limited asylum protections to "political" refugees.[3]

---

Wash. L. Rev. 913, 927–28 (1987); *see also* Stanley D. Radtke, *Defining a Core Zone of Protection in Asylum Law*, 10 J.L. & Soc. Challenges 22, 28–29 (2008) ("The 1951 Convention was essentially designed as a weapon to use against the Soviet Bloc in the impending Cold War, limiting refugee protection to individuals strictly on the basis of a deprivation of civil or political rights. Thus, the [Convention] Framers' intent, the historical context, and the politicized nature of the refugee definition indicate that refugee protection was intentionally limited.").

[2] *See* Paul Tiedemann, *Protection Against Persecution Because of 'Membership of a Particular Social Group' in German Law*, *in* The Changing Nature of Persecution 340, 348 n.24 (International Association of Refugee Law Judges, 4th Conference, Berne, Switzerland, Oct. 2000), https://perma.cc/KUU5-DD94.

[3] By the end of the Second World War, Sweden had accepted large numbers of political refugees from its Scandinavian neighbors and the Baltic states, including many Jews. Mikael Byström and Pär Frohnert, *Invandringens historia: Från "folkhemmet" till dagens Sverige* 21–25 (2017), https://perma.cc/A2G9-DKGM. Sweden's 1954 Aliens Act, which was drafted at the same time the Convention was negotiated, revised Swedish immigration law to reflect these asylum practices. Emma Persson, *Flykting? En studie i asylrätt* 30 (2006) (L.L.M. thesis, Lund University), https://perma.cc/NJF3-42D9. As a

Later, the 1967 United Nations Protocol Relating to the Status of Refugees incorporated the Convention's definition of "refugee," while removing the temporal and geographic restrictions. *Opened for signature* Jan. 31, 1967, 606 U.N.T.S. 267, 19 U.S.T. 6223 [hereinafter "Protocol"]. The United States—which had not signed the 1951 Convention—acceded to the Protocol in 1968. *See Cardoza-Fonseca*, 480 U.S. at 429. Initially, the United States relied on executive action to comply with its obligations under the Protocol. *See INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984). In 1980, Congress passed the Refugee Act and incorporated the Protocol's definition of "refugee" into the Immigration and Nationality Act. Pub. L. 96–212, 94 Stat. 102 (1980) (codified at 8 U.S.C. § 1101(42)(A)).[4] And Congress did not draft a new definition of a "particular social group," instead adopting the phrase "with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." H.R. Rep. No. 96-781, at 20 (1980) (Conf. Rep.), *as*

---

result, both the Convention and the 1954 Aliens Act recognized the same five protected categories. *See* Utlänningslagen § 2 (Svensk författningssamling [SFS] 1954:193) (Swed.). The Aliens Act's legislative history suggests that this definition was intended to encompass only those suffering persecution because of "political circumstances," Proposition [Prop.] 1954:41 at 75, Kungl. Maj:ts proposition till riksdagen med förslag till utlänningslag [King's bill] (Swed.), offering no protection to asylum claimants who could not be considered political refugees. While the Convention and the Aliens Act were not identical, their shared background demonstrates that "particular social groups" possessed a distinctly political character—that is, persecution by a state to serve its political ends.

[4] The Refugee Act tweaked the language of the fourth category from "membership *of* a particular social group" to "membership *in* a particular social group." *Compare* Convention Art. 1(A)(2), *with* 8 U.S.C. § 1101(42)(A) (emphases added).

4

*reprinted in* 1980 U.S.C.C.A.N. 160, 161. All evidencing a particular political meaning surrounding protected social groups.

## II.

From there came a volley of interpretations arising from attempts by the Attorney General to respond to conflicting circuit court diktats. The result: a strange marriage of opinions that cabin the Executive's discretion in the immigration context, where "[j]udicial deference to the Executive Branch is especially appropriate." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 416 (1999).

Sporadic and inconclusive judicial opinions marked early applications of the term,[5] and, in 1985, the Attorney General explained that "Congress did not indicate what it understood this ground of persecution to mean, nor is its meaning clear in the Protocol." *Matter of Acosta*, 19 I. & N. Dec. 211, 232 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 201 (BIA 1987). So the BIA turned to statutory canons and United Nations guidance[6] to determine that "the phrase 'persecution on account of membership in a particular social group' . . . mean[s] persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such

---

[5] Several early cases considered the term in the context of withholding of removal. *See, e.g., Chavez v. INS*, 723 F.2d 1431 (9th Cir. 1984); *Ananeh-Firempong v. INS*, 766 F.2d 621 (1st Cir. 1985).

[6] Which, at the time, was viewed as an appropriate reference. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 438–39 (1987).

5

as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership." *Id.* at 233.

Most of the circuit courts adopted this definition. But a Ninth Circuit panel offered a standardless standard, defining a particular social group as "a collection of people closely affiliated with each other, who are actuated by some common impulse or interest," *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986),[7] to which a Second Circuit panel added that "the attributes of a particular social group must be recognizable and discrete," *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991). Neither articulation offers much guidance. But presuming itself bound to follow these rulings, the Board added that a group must have "particularity" and be "recognizable by others in the country in question." *In re C-A-*, 23 I. & N. Dec. 951, 957, 960 (BIA 2006).

The BIA fleshed out these two new requirements in later decisions. In 2007, it declared that "social visibility" required that "the shared characteristic of the group should generally be recognizable by others in the community," and that "particularity" necessitated that "group membership" can be "delimit[ed] for a large swath of potential members." *In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 74, 76 (BIA 2007). And the next year, it stated that "membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility. These concepts of 'particularity' and 'social visibility' give greater specificity to the definition of a social group, which was first determined in *Matter of Acosta*, to be a

---

[7] Another Ninth Circuit panel later adopted *Acosta*'s innate characteristic standard as an alternative. *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1092 (9th Cir. 2000).

6

group whose members 'share a common, immutable characteristic.'" *Matter of S-E-G-*, 24 I. & N. Dec. 579, 582–83 (BIA 2008) (citations omitted). But again, courts rejected the new formulation. *See, e.g.*, *Gatimi v. Holder*, 578 F.3d 611, 615–16 (7th Cir. 2009); *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 608 (3d Cir. 2011).

So it was back to the BIA drawing board and a new formulation: a particular social group must be "socially distinct"; that is, "perceived as a group by society." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014). And that is where things stand for the Executive: "a cognizable particular social group must be '(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" *Matter of K-E-S-G-*, 29 I. & N. Dec. 145, 147 (BIA 2025) (citing *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237). A test that largely flows from judicial edits to the Executive's drafting, leading to an endlessly expanding circle of groupings around a hopelessly indeterminate definition that excludes almost no imaginable applicant.[8]

---

[8] *See, e.g.*, *Garcia v. Att'y Gen.*, 665 F.3d 496, 504 (3d Cir. 2011) (people who "assist[] law enforcement against violent gangs that threaten communities in Guatemala"); *Doe v. Att'y Gen.*, 956 F.3d 135, 142 (3d Cir. 2020) ("the lesbian, gay, bisexual, transgender and intersex (LGBTI) community in Ghana"); *Guzman Orellana v. Att'y Gen.*, 956 F.3d 171, 179 (3d Cir. 2020) ("persons who publicly provide assistance to law enforcement against major Salvadoran gangs"); *Cece v. Holder*, 733 F.3d 662, 673 (7th Cir. 2013) (en banc) ("young Albanian women living alone"), *Temu v. Holder*, 740 F.3d 887, 892–97 (4th Cir. 2014) ("individuals with bipolar disorder who exhibit erratic behavior"); *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986) (membership in one's own family).

**III.**

There is no way to fit all these unbounded classifications into the original understanding of a "particular social group." Divorced from context, and unmoored from history, the phrase (like almost any) might mean anything. But in easy and hard cases alike, our task is the same: to identify the statute's "single, best meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Some guideposts to follow when we take up the task:

First, we should not look to evolving guidelines from the United Nations to update the statute, since that is a task for Congress, not courts.[9] Second, to the extent that interpretation of the meaning of "particular social group" is the proper province of the judiciary, we should reconsider our adoption of *Acosta*'s premise that "a shared past experience may be enough to link members" sufficient to form a particular social group. *See Lukwago v. Ashcroft*, 329 F.3d 157, 178 (3d Cir. 2003) (citing *Acosta*, 19 I. & N. Dec. at 233). Nothing in the other bases for refugee status (race, religion, nationality, and political opinion) suggests that, standing alone, any past experiences are by themselves enough to define a protected group. Allowing experience-based social groups only serves to swallow the other four. Calling such an expansion of "the fundamental details of a regulatory scheme in vague terms or ancillary provisions" an elephant hiding in the mousehole barely apprehends the flood of immigrant applicants allowed to squeak

---

[9] *Contra Perdomo v. Holder*, 611 F.3d 662, 667 (9th Cir. 2010); *Castillo-Arias v. Att'y Gen.*, 446 F.3d 1190, 1197 (11th Cir. 2006).

through a crevice Congress did not create. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

A straightforward interpretation emerges: a "particular social group" refers to persecution by a foreign sovereign against a political minority based on political disagreements. Not disfavored groups, not similarly situated groups, and certainly not groups claiming random displeasure with their home country or, as here, the hardships caused by skipping out on loans from loan sharks. All of which is consistent with our earliest "hope[] that this land might become a safe & agreeable Asylum to the virtuous & persecuted part of mankind, to whatever nation they might belong" through the "spirit of the Religions and the genius of the political Institutions of this Country" toward "persons of moderate property, who are determined to be sober, industrious & virtuous members of Society." Letter from George Washington to Francis Adrian Van der Kemp (May 28, 1788), https://perma.cc/9ZGZ-YM63. As ordinarily and originally understood, § 1101 refers to a "particular social group" of similar values facing the same political threats identified in the 1951 Convention as recognized by the United States via the 1967 Protocol. Nothing more.

\* \* \*

There is no evidence that the term "particular social group" was intended to "open the immigration floodgates to everyone in the world who is oppressed." *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1096 (9th Cir. 2013) (Kozinski, J., dissenting). And, in any event, I am skeptical that the interpretation of "particular social group" is our call at all instead of intrinsic to "the Executive's ability to carry out his duty to take care of

9

immigration matters, a power that is both derived from congressional will and inherent in any sovereign." *Qatanani v. Att'y Gen.*, 144 F.4th 485, 505 (3d Cir. 2025) (Matey, J., dissenting).[10] So I join the Panel's excellent opinion in full but look forward to returning our application of the law to the parameters Congress set, and the Executive enjoys, in a future matter.

---

[10] My unease is compounded by the fact that our Nation's obligation to grant asylum to particular social groups initially arose from a treaty and "[r]espect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999).